1
2
3
4
5
6
7
8  **IN THE UNITED STATES DISTRICT COURT FOR THE**
9  **EASTERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11  BRITZ FERTILIZERS, INC.,              )<br>                                          )<br>12              Plaintiff,                  )<br>                                          )<br>13        v.                               )<br>                                          )<br>14  NATIONWIDE AGRIBUSINESS               )<br>    INSURANCE COMPANY,                    )<br>15                                         )<br>                                          )<br>16              Defendant.                 )<br>    _____ )  | 1:10-cv-02051-AWI-MJS<br><br>ORDER RE: MOTIONS FOR<br>SUMMARY JUDGMENT<br><br>(Docs. 79, 82) |

17
18
19                      **I. INTRODUCTION**
20
21  Plaintiff Britz Fertilizers, Inc. ("Plaintiff" or "Britz") and defendant Nationwide Agribusiness
22  Insurance Company ("Defendant" or "Nationwide") have filed competing motions for summary
23  judgment or partial summary judgment (i.e., summary adjudication) in the alternative pursuant to
24  Federal Rule of Civil Procedure 56.  For reasons discussed below, Nationwide's motion shall be
25  granted in part and denied in part; Britz's motion shall be denied in its entirety.
26
27                **II. FACTS AND PROCEDURAL BACKGROUND**
28

The Court refers the parties to previous orders for a complete chronology of the proceedings.  On November 4, 2010, Britz filed its original complaint against Nationwide asserting one cause of action for declaratory relief.  Britz followed up with a first amended complaint on October 28, 2011, asserting causes of action for reformation, declaratory relief, breach of contract and bad faith.  On July 27, 2012, Britz filed its second amended complaint against Nationwide and alleged as follows:

> "Britz and Nationwide negotiated for and mutually agreed that, Farmland Mutual Insurance, through its subsidiary company, Nationwide, would provide Britz commercial general liability ('CGL') coverage, to include Agronomists Errors and Omissions coverage ('Ag E&O' or simply 'E&O'), with limits of $1 million per occurrence and [$]1 million annual aggregate, and also to include Products/[Completed] Operation[s] coverage ('Products'), with limits of $1 million per occurrence and $2 million annual aggregate.  Those coverages were to be part of a package insurance policy to also include property coverage and commercial auto coverage.  Nationwide also agreed to provide Britz a $10 million umbrella coverage to 'follow form' the CGL coverages."

Britz further alleged:

> "On August 31, 2011, Nationwide offered the foregoing package policy to Britz, in a 25-page written offer of insurance by it entitled, 'Farmland Mutual Insurance and Nationwide Agribusiness Insurance Commercialgard Quote' (the 'Quote'). [¶] On the same day, August 31, 2011, following receipt by Britz of the Quote, Britz signed and returned to Nationwide an acknowledgment accepting the Quote.  Thereafter, Britz paid the full year's premium."

Britz further alleged:

> "On or about September 26, 2001, the umbrella coverage was modified, to increase the coverage to $15 million, and Britz paid an additional premium for the increased coverage. [¶] The coverage period for the package insurance policy was from September 10, 2001 to September 10, 2002. [¶] Thus, Nationwide issued to Britz a package policy of insurance described as Commercial General Liability Insurance Policy No. CMG118004A (the 'CGL policy') and as Commercial Umbrella Liability Policy No. CVL118004A (the 'Umbrella Policy'), both effective from September 10, 2001 to September 10, 2002."

Britz further alleged:

> "At all material times herein, Britz'[s] practice was not to charge growers a fee for crop consulting services and for recommendations by Britz'[s] salesmen, who were known as 'PCAs' (Pest Control Advisors) for use of agricultural chemicals.  Those services were

2

incidental to the sales by Britz of agricultural chemicals.  The premise was that if the use of an agricultural chemical by a grower was recommended by a Britz PCA, the grower would purchase the chemical from Britz. [¶]  At all material times herein, the fact that Britz'[s] practice was not to charge a fee for crop consulting services and recommendations was known to Nationwide."

Britz further alleged:

"On or about August 9, 2002, Britz provided to the Nationwide liability claims unit notice of a claim against Britz by Ahmad Skouti, a Fresno County grape grower, and one of his lessors, Walter Johnsen . . . . Skouti asserted crop damage arising out of the use of chemicals which Britz sold to Skouti through a Britz salesman, who allegedly provided advice as to the use of the chemicals sold.  Nationwide began investigation of the claim.  By September 1, 2002, Nationwide assigned the claim to an adjuster and denied Skouti's demand."

Britz further alleged:

"On December 18, 2002, Skouti and Johnsen filed suit against Britz (the 'Skouti Action') in the California Superior Court, County of Fresno, Case No. 02CECG04540.  Within a week thereafter, Britz tendered defense and indemnity to Nationwide, and the Skouti Action was tendered within a week to Nationwide for a defense.  The Skouti Action stated causes of action for breach of contract, negligence, products liability, breach of warranty, and declaratory relief, all arising from the sale of chemicals by Britz to Skouti through its salesman who also incidental to the sale allegedly gave advice to Skouti as to how to use the chemicals."

Britz further alleged:

"Nationwide accepted the tender for defense under the CGL Policy, which contains stated limits for Products Coverage of $1 million per occurrence and $2 million Aggregate.  However, at all times herein, Nationwide only acknowledged coverage under an Ag E&O endorsement, form CMG7220500, attached to the CGL Policy, notwithstanding that although the endorsement provided coverage only for consulting services for which a fee was charged, Skouti and Johnsen never allege [sic] that Britz charged a fee for such services. [¶]  At all times herein, Nationwide concealed coverage, in addition to or alternatively to the Ag E&O coverage under the Products/Completed Operations provisions of the basic CMG general liability portion of the Britz Policy, form CMGB3030500, and corresponding Products/Completed Operations coverage under the Umbrella Policy no[.] CUL118004A, notwithstanding that the Skouti Action explicitly alleged products liability claims."

Britz further alleged:

"The Skouti Action was tried before a jury in 2005.  On April 14,

3

2005, judgment was entered against Britz in the amount of $7,596,247.00 plus costs of $29,745.25, for a total judgment of $7,625,993.23. [¶] Britz appealed the judgment to the California Court of Appeal, 5th Appellate District.  An Undertaking on Appeal was filed by Britz on or about June 23, 2005.  The Undertaking consisted of $9,938,989.00 cash furnished by Britz and a $1.5 million surety bond furnished by Nationwide Mutual Insurance Company, an affiliate of Nationwide. [¶] The judgment was affirmed by the California Court of Appeal on July 6, 2007.  A Petition for Review was denied by the California Supreme Court."

Britz further alleged:

"The judgment was satisfied in November, 2007, by payment of $9,562,132.41 to Skouti and Johnsen. $1,183,088.55, which included $183,088.55 post-judgment interest on $1,000,000.00, was paid by Nationwide.  The balance, $8,379,043.85, was paid by Britz.  Its attorney fees in the trial court were paid initially by Nationwide and subsequently by Bayer Corporation, the manufacturer of one of the products which Britz had sold to Skouti.  Britz attorney fees on appeal were paid in part by Nationwide.  Britz used its own counsel post-verdict to some extent.  Britz paid their fees.  Nationwide subsequently failed to do so.  The amount which Nationwide failed to reimburse Britz for is approximately $50,000."

Britz further alleged:

"The $1 million and the post-judgment interest on that amount was paid by Nationwide pursuant to its $1 million limit set forth in its Ag E&O endorsement, form CMG7220500, attached to the General Liability section of the CGL policy.  Nationwide did not pay anything pursuant to its Products/Completed Operations provisions of its CGL policy.  Nationwide did not pay anything under its umbrella policy in that regard . . . . [¶] Britz has requested Nationwide indemnify Britz for the $8,379,043.95 paid by Britz.  Nationwide has refused . . . ."

Britz further alleged:

"Effective as of October 29, 2008, Nationwide and Britz executed a Tolling Agreement tolling after that date the running of any Statute of Limitations with respect to all claims, demands, actions and causes of action which either party had or might have against the other arising out of or related to the Skouti Action.  The Tolling Agreement expired November 7, 2010. [¶] Nationwide is equitably estopped to assert the running of the Statute of Limitations for any period or periods prior to October 29, 2008, because of the concealment and misrepresentation.  Britz reasonably did so.  Britz was not aware of Nationwide's concealment and misrepresentation until Britz reviewed documents produced by Nationwide within the last few months."

Incorporating the foregoing allegations by reference, Britz further asserted the following seven

4

causes of action: (1) reformation of "the Umbrella Policy, *ab initio*, to specifically include Ag E&O coverage;" (2) declaratory relief seeking "a judicial declaration that Nationwide is obligated to indemnify Britz under the Umbrella Policy for the $8,379,043.85 paid by Britz in the Skouti Action, that Nationwide is obligated to indemnify Britz under the CGL policy and the Umbrella Policy for all post-judgment interest paid by Britz in the Skouti Action, and that Nationwide is obligated to reimburse Britz under the CGL and the Umbrella Policy and under Nationwide's written agreement with Britz to do so, for all of Britz'[s] post-judgment attorney fees and costs in the Skouti Action;" (3) declaratory relief "determin[ing] that the professional services exclusions in the CGL Policy and the Umbrella policy are only for services furnished for a fee;" (4) declaratory relief seeking "a judicial determination that Nationwide was obligated to defend and indemnify Britz in the Skouti Action under the Products coverage of the CGL policy and under the Umbrella Policy;" (5) breach of contract; (6) bad faith (i.e., breach of the covenant of good faith and fair dealing); and (7) fraud.

On March 25, 2013, Britz and Nationwide filed competing motions for summary judgment or partial summary judgment (i.e., summary adjudication) in the alternative pursuant to Federal Rule of Civil Procedure 56.  On April 22, 2013, each party filed its respective opposition to the other party's motion.  The parties filed their respective replies to the other's opposition on April 29, 2013.

### III. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see* Fed. R. Civ. P. 56(c)(1)(A). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Securities Litigation,* 627 F.3d 376, 387 (2010) (citing *Celotex, supra,* at p. 325). If the moving party meets its initial burden, the burden shifts to the non-moving party to present evidence establishing the existence of a genuine dispute as to any material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538. A court ruling on a motion for summary judgment must construe all facts and inferences in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Even if the motion is unopposed, the movant is not absolved of the burden to show there are no genuine issues of material fact, *Henry v. Gill Industries, Inc.,* 983 F.2d 943, 949-50 (9th Cir. 1993), although the court may assume the movant's assertions of fact to be undisputed for the purposes of the motion and grant summary judgment if the facts and other supporting materials show the movant is entitled to it. *See* Fed. R. Civ. P. 56(e)(2), (3).

## IV. DISCUSSION

The parties have stipulated to the following undisputed facts: Nationwide issued Britz a commercial general liability insurance policy (number CMG118004A) and a commercial umbrella liability insurance policy (number CUL118004A), both with an effective policy period of September 10, 2001 to September 10, 2002. Britz now contends summary judgment must be granted in its favor because coverage existed under both of these policies, as issued and/or as reformed, for the adverse judgment entered against it in the underlying state court action of *Skouti v. Britz Fertilizers, Inc.,* Fresno County Superior Court case no. 02CECG04540 (aff'd on appeal, 2007 WL 1954089). Nationwide contends summary judgment must be granted in its favor because coverage existed only under the commercial general liability (but not the umbrella) policy and it paid that policy's limits.

Britz appears to assert three theories of coverage against Nationwide.  The first theory is that when Britz purchased the umbrella policy, Nationwide represented to Britz it would be endorsed with the same Agricultural Consultants Errors and Omissions (E&O) endorsement contained in the commercial general liability policy that Nationwide apparently invoked to provide partial coverage for the Skouti action.  After the defense of the action was tendered to Nationwide, Nationwide denied the umbrella policy was so endorsed, and no E&O language appears therein.  Britz asserts the umbrella policy must therefore be reformed on ground of fraud to include an E&O endorsement.

The second theory is more complex.  Nationwide appears to have denied coverage under the umbrella policy on the basis of two exclusions: a professional services exclusion (Exclusion K) and an applicator exclusion (Exclusion Q).  The professional services exclusion provides insurance does not apply to "[b]odily injury, personal injury or property damage arising out of the rendering or failure to render professional services by the insured or by any person for whose acts or omissions the insured is legally responsible."  The applicator exclusion as modified provides insurance does not apply to "[b]odily injury or property damage arising out of the application of or failure to apply herbicides, pesticides, fertilizer or other similar chemicals by [¶] (a) aircraft owned, operated by, rented or loaned to any insured; or [¶] (b) any non-owned aircraft."  Nationwide took the position the injury alleged in the Skouti action resulted from erroneous advice one of Britz's pest control advisors, Randall Hedman, had given the Skouti plaintiffs on how to mix and apply to their grape crops certain chemicals they had purchased from Britz, thereby implicating the exclusions.  Britz now asserts the parties understood "professional services" to mean services rendered for a fee, and that because Britz charged the Skouti plaintiffs only for the chemicals, not Hedman's services, the professional services exclusion did not apply.  Britz further asserts the applicator exclusion did not apply because there is no evidence Britz applied the chemicals for Skouti.  Consequently, Britz contends the injury alleged in the Skouti action could only have been characterized as "property damage occurring away from premises you [the insured] own or rent and arising out of your [the insured's] product or your [the insured's] work" within the meaning of the umbrella policy's

7

products-completed operations hazard such that the injury was covered under the hazard provision.

As its third and final theory, Britz appears to contend the parties' contractual obligations are governed not by the as-issued versions of the commercial general liability and umbrella policies, but by Britz's acceptance of a 25-page insurance quote prepared August 31, 2001 by Nationwide purportedly offering E&O coverage. Britz contends its employee Robert Glassman signed the quote the same day and Britz later paid the required premiums as requested, and appears to suggest this transformed the quote into an insurance policy that, being inconsistent with the policy later issued, was not superseded as a matter of law but rather constituted the contract of insurance between the parties. With these theories in mind, the Court proceeds to address the parties' respective arguments.

***A. Statutes of limitations*** – As a threshold matter, the parties dispute the application of the statutes of limitations governing Britz's claims and whether, under those statutes, the claims are time barred.

***1. Statute of limitations for reformation*** – Nationwide first contends Britz's cause of action for reformation is untimely. Britz, on the other hand, contends this cause of action was timely filed. Incorporating allegations in the factual background of the second amended complaint, Britz alleged:

> "When Nationwide sent Britz the Quote on August 31, 2001, Nationwide included a 4-page 'Memo' explaining the proposed coverage. The Memo stated in pertinent part, [¶] 'Agriculture Consultants Error and Omission's [sic] coverage has been included in the quote. Please note that this is not a true E&O coverage. It is part of the General Liability and is therefore on an occurrence basis. There must be bodily injury or property damage to trigger a claim. It will not address an economic loss unless there is bodily injury or property damage.' [¶] Britz, in accepting the Quote, relied on the Memo."

Britz further alleged:

> "The Memo also stated that higher limits were available, for an additional premium, for the umbrella coverage. Britz later requested a higher limit, and paid the additional premium. Britz would not have requested the higher limit and paid the additional premium if it believed that the umbrella coverage did not include E&O, because E&O was Britz'[s] primary concern. [¶] It was not until nine months after Britz accepted the Quote, that all the actual insurance policy

8

forms including the Umbrella Policy and related endorsements were provided by Nationwide, even though the insurance policy period ran from September 10, 2001 to September 10, 2002."

Britz further alleged:

"On several occasions, from December 19, 2001 through June 11, 2002, employees of Britz'[s] insurance agent, Jerry Baird Insurance Agency ('Baird'), Fresno, communicated with employees of Nationwide's appointed insurance agent, Hilb, Rogal, and Hamilton ('HRH'), Fresno, regarding the policy forms, including all endorsements which were to be issued pursuant to the accepted Quote. On all such occasions, HRH informed Baird that the Umbrella Policy would 'follow form' over the CGL coverage, including Ag E&O coverage."

Britz further alleged:

"For example, on February 12, 2002, Darla Ferriera ('Ferriera'), an employee of Baird, emailed a message to Melodie Rogers ('Rogers'), an employee of HRH, to inquire as to when the endorsements and policy forms would be completed. Ferriera requested assurance that the Umbrella Policy did, in fact, 'follow form' over the CGL coverage to include E&O coverage. [¶] On February 12, 2002, Rogers responded that '[b]ased on Farmland's proposal, their intent was to provide 'following form' over the employer's liability and E&O. [¶] Rogers was an account officer of Nationwide's appointed agent, HRH, and she was an authorized agent to speak on behalf of Nationwide. Because Rogers and HRH were acting as authorized agents of Nationwide, Britz was justified in relying on the Quote and on the confirming statements made by Rogers. Britz did so."

Britz further alleged:

"The Quote's offer of following form umbrella coverage over the CGL coverage including E&O coverage was a representation that was part of the negotiation process Britz and Nationwide which [sic] preceded the Quote. Nationwide intended that Britz rely on its statements when entering into the contract. Also, once Britz accepted the Quote, the representations continued as described above. [¶] In reliance on the Quote, Britz purchased the quoted insurance coverage including the umbrella coverage. Thereafter, Nationwide's agents continued to represent to Britz that Nationwide's intent was to include E&O coverage in the umbrella coverage, and continued to represent that the Umbrella Policy was to be a following form policy over the CGL Policy which, in turn, included the E&O coverage."

Britz further alleged:

"On June 11, 2002, despite the confirmation by Nationwide's agents that the Umbrella Policy 'followed form' over the CGL Policy, and specifically that E&O coverage was a part of the Umbrella Policy,

9

Nationwide, for the first time, denied that the E&O Coverage in the CGL policy was included in the Umbrella Policy. [¶] After June, 2002, continuing through June, 2003, there was correspondence and discussion between Britz and Nationwide regarding Nationwide's position that the Umbrella policy did not include E&O coverage."

Britz further alleged:

"A meeting occurred between Britz representatives and Nationwide representatives at Britz'[s] office in Fresno on April 7, 2003, for discussion of the E&O issue and another issue. [¶] At that time, the other issue was a claim by Britz that Nationwide had paid approximately $838,000 without Britz'[s] knowledge or consent to a grower ('Rio Bravo') who asserted a fictitious E&O claim, thereby depleting Britz'[s] $1 million E&O coverage limit under the CGL policy. The meeting was followed by a letter from Nationwide's Western Region Director dated June 17, 2003, to a Britz representative, wherein the Region Director offered to resolve the Rio Bravo issue and stated 'I am sure that we would both like to get this initial issue behind us as quickly as possible[.]' [¶] The 'initial issue' was the Rio Bravo issue. It was resolved by reinstating the $1 million E&O coverage afforded by the CGL Policy. The other issue was E&O umbrella coverage. That issue remained unresolved."

Britz further alleged:

"The Region Director's [sic] later requested a response within 15 days. [¶] There was a telephone discussion a few days later between Britz'[s] VP/CFO, Robert Glassman, and the Region Director, Gary Gargano, wherein they agreed that the E&O umbrella issue would remain 'open' pending final resolution of the Skouti Action, because if the Skouti Action resulted in a defense verdict or a verdict for less than $1,000,000.00, there would be no umbrella issue. At all times, Britz relied on Gargano's representations that the parties would continue to discuss and ultimately resolve the E&O umbrella issue following resolution of the Skouti Action. In reliance thereon, Britz delayed filing this action at and after that time, and later entered into the Tolling Agreement to further extend the time until the related case, the Bayer Corporation indemnity action (an action by Britz seeking indemnity from Bayer, the manufacturer of one of the products which Skouti purchased from Britz)[,] was resolved."

Britz further alleged:

"In mid-May, 2003, Britz VP/CFO, Robert Glassman, received a letter from Vicki Liebe, an authorized representative of Nationwide, dated May 12, 2003, regarding the Skouti Action. The letter stated as follows: [¶] 'Please let this letter serve as notification that I have taken over the handling of this claim from Eddie Rodriguez, and will be handling it to its conclusion. Please feel free to contact me at any time if you have any questions and I'll be happy to help you.' [¶] Robert Glassman talked with Vicki Liebe by telephone as soon as he

10

received her mid-May, 2003, letter.  He discussed the Skouti Action with her.  He told her that Britz had two E&O claims, one under the CGL Policy and one for the umbrella coverage under the Umbrella Policy.  She said that she had two files, one for each claim, and that both files were open.  Glassman also told her that product manufacturer Bayer Corporation had agreed to pay the defense costs in the Skouti Action, and the Britz was asserting an indemnity claim against Bayer."

Britz further alleged:

"Thereafter, Glassman talked with Liebe on several occasions during the trial court phase and during the appellate phase of the Skouti Action.  Glassman repeatedly stated to Liebe that Britz had two claims against Nationwide, one under the CGL Policy and one for umbrella coverage under the Umbrella Policy.  Liebe repeatedly stated that she continued to have two open claim files, one for the CGL Policy and one for the Umbrella Policy. [¶] Britz reasonably relied on Liebe's statements, and in reliance thereon, Britz delayed filing this action."

Britz further alleged:

"When the Skouti Action was finally resolved[,] Britz filed an indemnity action against Bayer Corporation.  The Tolling Agreement described in . . . this Second Amended Complaint was executed by Britz and Nationwide and set forth their mutual understanding that despite the final resolution of the Skouti Action, Britz'[s] claims against Nationwide would continue to be open pending resolution of Britz'[s] action against Bayer. [¶] Britz'[s] action against Bayer was subsequently resolved by settlement.  This action by Britz against Nationwide was filed immediately after resolution of Britz'[s] action against Bayer. [¶] Britz requests that this Court reform the Umbrella Policy, *ab initio*, to specifically include Ag E&O Coverage, so as to conform to the intent of the parties at the time of contracting for the insurance package purchased by Britz."

Nationwide now points to the fact Britz, by its own allegations, admits Nationwide informed Britz on June 11, 2002, the Agricultural Consultants Errors and Omissions (E&O) coverage contained in the commercial general liability policy was not included in the umbrella policy (i.e., the umbrella policy did not "follow form" over the general liability policy with respect to E&O coverage).  From this, Nationwide contends Britz was required to bring its reformation claim no later than June 11, 2005 under the three-year statute of limitations for reformation, and that this cause of action must therefore be dismissed as time barred because Britz did not file a complaint until November 4, 2010.

"[A] court may reform a contract to add a concept that is not present in the contractual

11

language." *Alameda County Flood Control v. Department of Water Resources,* 213 Cal.App.4th 1163, 1195 n. 31, 152 Cal.Rptr.3d 845 (2013).  "[California] Civil Code section 3399 provides the authority upon which a contract may be reformed[.]" *Jolley v. Chase Home Finance, LLC,* 213 Cal.App.4th 872, 908, 153 Cal.Rptr.3d 546 (2013).  That statute states in full, "When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value."  Cal. Civ. Code, § 3399.

The gravamen of Britz's claim to reform the umbrella policy is fraud, and California Code of Civil Procedure section 338, subdivision (d), establishes a three-year statute of limitations in, as here, an action "for relief on the ground of fraud or mistake."  Cal. Code Civ. Proc., § 338, subd. (d). "[A] cause of action to enforce such reformation accrue[s], under [section 338], upon the discovery of the facts constituting the [fraud or] mistake."  *Bradbury v. Higginson,* 167 Cal. 553, 140 P. 254 (1914) (citing Cal. Code Civ. Proc., § 338, subd. (d) ("[A] cause of action [for relief on the ground of fraud or mistake] is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake")).  Britz alleged Nationwide represented to Britz its intent was to include E&O coverage in the umbrella coverage, and that the umbrella policy was to be a following form policy over the commercial general liability policy in that respect.  Britz further alleged that on June 11, 2002, after Britz had already purchased the umbrella policy, Nationwide denied the umbrella policy contained the same E&O coverage included in the commercial general liability policy.  These allegations show that by 2002, Britz had discovered the false representation constituting the fraud through which Nationwide allegedly induced Britz to purchase the umbrella policy.  Accordingly, Britz's claim for reformation premised on fraud accrued in 2002.  *See North Star Reinsurance Corp. v. Superior Court*, 10 Cal.App.4th 1815, 1822-23, 13 Cal.Rptr.2d 775 (1992) (holding that cause of action for reformation based upon mistake accrued within meaning of section 338 on insured's receipt of letter from insurer showing presence of exclusions from coverage

which insured alleged were included in its insurance policy by mistake and entitled it to reform policy). Thus, the three-year limitations period of section 338, subdivision (d) expired in 2005, three years after Britz knew or should have known about the possibility of fraud by Nationwide. Because Britz's original complaint was not filed until November 4, 2010, its reformation claim was untimely.

A finding Britz was on notice by 2002, and certainly no later than 2003, that Nationwide did not write the umbrella policy to include E&O coverage despite its contrary representations, if any, to Britz, is supported by the record. The evidence shows that at 2:11 p.m. on June 11, 2002, Terry Ward, a Nationwide underwriter, sent to Melodie Rogers of Hilb, Rogal and Hamilton Insurance Services, the company that brokered the policy for Britz's agent, the Jerry Baird Agency (which had not been appointed by Nationwide to solicit insurance applications), an e-mail providing as follows:

> "We have been researching the issue of the umbrella and the Agriculture Consultants Liability. [¶] The liability form in the underlying CMG policy includes the standard language that includes professional liability. The commercial umbrella form includes the same exclusion. [¶] The Agriculture Consultants coverage can be added to the CMG policy by the Agriculture Consultant endorsement. The endorsement language modifies the liability coverage part allowing for the coverage. The form actually imposes separate conditions, limits and deductibles. No change is made to the umbrella policy language that will allow it to address the underlying policy exposure. [¶] We hope that this provides the explanation for the umbrella not addressing the consultants exposure. Please advise the Baird Agency of these findings."

At 2:14 p.m. on the same day, Rogers forwarded Ward's email to Darla Ferriera of the Jerry Baird Agency, characterizing the email as "confirmation that the Umbrella policy does NOT extend over the AG Consultants Liability." At her deposition, Ferriera testified she received the email and understood it to mean Nationwide's position was the umbrella policy did not extend over the E&O liability coverage. Ferriera further testified that after she received the email, she went directly to Jerry Baird and informed him accordingly. At his deposition, Baird acknowledged he was informed. Baird testified his agency disagreed with Nationwide's position, but "there's not much we could do at that time because of all the problems in the liability field, especially ag consultants and farm chemical dealers and so forth. I mean, markets were drying up because of the 9/11 situation . . . ."

13

At 9:08 a.m. on January 6, 2003, Eddie Rodriguez, the Nationwide adjuster who initially handled Britz's claim for the Skouti action, sent an email to Michael Johnson, Nationwide's claims legal counsel, inquiring as follows: "Mike I working [sic] on the ROR [reservation of rights] for this new lawsuit.  Are there some coverage questions in the CMG [commercial general liability policy] regarding product liability, breach of implied warranty of merchantability and fitness?  Is our reservation directed to the sixth cause of action for declaratory relief only?"  Johnson responded to Rodriguez's email at 1:18 p.m. on January 7, 2003, stating in part: "First, we need to make sure there is a consultants E&O endorsement on both the CMG [commercial general liability policy] and CUL [umbrella policy]."  At 11:59 a.m. on January 7, 2003, Rodriguez emailed Ward: "Terry, I have a new law suit [sic] on Britz Fertilizer under the CMG for policy year 09-10-2001 to 09-10-2002.  Do they have endorsement CMBG722 Consultants Errors and Omisions [sic]?  Is there a similar endorsement fo [sic] the CUL?"  At 3:56 p.m. on January 7, 2003, Ward replied to Rodriguez, "This account does have the CMGB 722 endorsement.  The CUL, like the CMG, excludes coverage for errors and omissions.  We add the CMGB 722 to remove the exclusion on the CMG.  It is our intent to exclude the coverage from the umbrella."  Rodriguez faxed a copy of Ward's response to Johnson.

On January 15, 2003, Rodriguez wrote Britz a letter both parties seemingly acknowledge constituted Nationwide's reservation of rights under the policies at issue.[1]  In the letter, Rodriguez

---

[1] Around this time, Nationwide sent two letters to Britz: one dated January 9, 2003, and a revised, but substantially similar, letter dated January 15, 2003.  Evidence submitted by Nationwide establishes that when the January 15, 2003 letter was drafted and mailed, Nationwide intended for the letter to serve as its reservation of rights.  But at various points in the pleadings, Nationwide appears to contend the letter was not a reservation of rights but rather an unconditional denial of coverage, at least with respect to coverage under the umbrella policy.  Whether the letter constituted an unconditional denial of coverage under the umbrella policy is questionable.  First, even though the letter asserted exclusions to deny coverage, it contained no language *unequivocally* denying Britz's claim.  Second, the letter included the following statement: "If you have any knowledge of any additional facts or circumstances, which you believe would alter any of the positions taken by Nationwide . . . , please contact the undersigned at your earliest convenience so that I may consider them."  All of this made the letter highly equivocal.  Admittedly, "[a] statement of willingness to reconsider does not render a denial equivocal."  *Migliore v. Mid-Century Ins. Co.,* 97 Cal.App.4th 592, 605, 118 Cal.Rptr.2d 548 (2002).  But this presupposes the denial contained language that was

14

stated there would be coverage under the E&O endorsement of the commercial general liability policy for all causes of action in the Skouti complaint except for the declaratory relief count and the claim for emotional distress.   Rodriguez further stated the umbrella policy provided coverage in excess of the underlying coverage, but that the professional services exclusion contained in the umbrella policy applied to eliminate coverage under that policy for the entirety of Skouti's claims. Nowhere in the letter was it stated the umbrella policy contained the same E&O endorsement as the general liability policy or that an E&O endorsement superseded the professional services exclusion. On February 10, 2003, Britz's attorney Ted Frame responded with a letter addressed to Steve Simmons and Gary Gargano, Nationwide's Director of Claims and Western Region Director, respectively.   The letter stated, "It is not until June 11, 2002, that Farmland, for the first time, takes the position that the E&O coverage is separate from the CGL coverage and is not included in the umbrella.   The 'rub' is that Farmland's doing so contradicts what our client purchased, as shown by Farmland's August 31, 2001, Quotes.   In other words, the coverage you sold our client is significantly different from the coverage you are now providing. [¶] This is a classic case of failure to deliver the agreed-upon coverage. [¶] On behalf of our client, we request that you honor the coverage you sold to our client.   If it is necessary for our client to file an action for declaratory relief and/or reformation of the policy, our client will do so.   However . . . , our client's desire is to resolve this . . . in an amicable matter."   Frame's knowledge of these facts would have been imputed to Britz even if the facts were never communicated to Britz by Frame.   *See* Cal. Civ. Code, § 2332 (As

---

otherwise unequivocal in the first place.  *See id.* (language stating "no further benefits will be provided beyond those previously paid" was "unequivocal language that no further payment on the claim would be made"); *Singh v. Allstate Ins. Co.,* 63 Cal.App.4th 135, 142, 73 Cal.Rptr.2d 546 (1998) (letter denying claim and informing plaintiffs they had one year to file suit against insurer was unequivocal).   Third, and perhaps most importantly, the back-and-forth discussions regarding coverage suggests the parties treated the letter as anything but unequivocal.   Nationwide takes the abovementioned position in an effort to argue, of course, for the earliest possible accrual date for Britz's breach of contract and declaratory relief causes of action.   However, as shall be evident from the Court's discussion in subsequent sections of this order, whether the January 15 letter constituted an unconditional denial is not a material issue for statute of limitations purposes because, aside from the reformation claim, the letter does not control when Britz's causes of action accrued.

against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other"); *Herman v. Los Angeles County Metropolitan Transportation Authority,* 71 Cal.App.4th 819, 828, 84 Cal.Rptr.2d 144 (1999) ("[T]he agent's knowledge is imputed to the principal even where . . . the agent does not actually communicate with the principal, who thus lacks actual knowledge of the imputed fact. [Citations.] This principle applies to the attorney-client relationship. [Citation]").

In response to Nationwide's statute of limitations defense, Britz, conceding the three-year limitations period applies, first suggests the limitations period did not begin to run until the Skouti judgment was affirmed on appeal in July 2007 and Nationwide refused to indemnify Britz for anything more than approximately $1 million of the judgment under the E&O limits of the commercial general liability policy.  Britz then contends that because the parties executed a tolling agreement just over a year later, and Britz commenced its lawsuit against Nationwide before the tolling agreement expired, its reformation claim was timely.  Britz has provided no authority – and the Court's research reveals no authority – to support these propositions.  "The limitations period, the period in which a plaintiff must bring suit or be barred, runs from the moment a claim accrues," *Aryeh v. Canon Business Solutions, Inc.,* 55 Cal.4th 1185, 1191, 151 Cal.Rptr.3d 827, 292 P.3d 871 (2013) (citing, *inter alia*, Cal. Civ. Code, § 312 ("Civil actions, without exception, can only be commenced within the periods prescribed in this title, after the cause of action shall have accrued")). "Traditionally at common law, a 'cause of action accrues "when [it] is complete with all of its elements". . . .' [Citation.] This is the 'last element' accrual rule: [ ] the statute of limitations runs from 'the occurrence of the last element essential to the cause of action.' [Citations.]" *Id.* at p. 1191.

The elements of reformation (technically a remedy, not a cause of action) are threefold: "(1) the 'real' agreement the parties intended to execute; (2) the agreement as it was reduced to writing; (3) the grounds for reformation, whether fraud or mistake, and how it came about." *Maywood Club Tow v. City of Maywood,* 2010 WL 4277324 (Cal.App. 2 Dist. 2010) (unpublished), at *6 (citing,

16

*inter alia, Lane v. Davis,* 172 Cal.App.2d 302, 309, 342 P.2d 267 (1959))[2].  The last element essential to reformation is the basis for the reformation itself – here, fraud.  Again, a claim for fraud accrues upon discovery, by the aggrieved party, of the facts constituting the fraud.  Cal. Civ. Code, § 338, subd. (d).  "The courts interpret discovery in this context to mean not when the plaintiff became aware of the specific wrong alleged, but when the plaintiff suspected or should have suspected that an injury was caused by wrongdoing.  The statute of limitations begins to run when the plaintiff has information which would put a reasonable person on inquiry.  A plaintiff need not be aware of the specific facts necessary to establish a claim since they can be developed in pretrial discovery."  *Kline v. Turner,* 87 Cal.App.4th 1369, 1374, 105 Cal.Rptr.2d 699 (2001).  These principles are encapsulated in California's delayed discovery rule, which provides "suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period."  *Fox v. Ethicon Endo-Surgery, Inc.,* 35 Cal.4th 797, 807, 27 Cal.Rptr.3d 661, 110 P.3d 914 (2005) (citing *Norgart v. Upjohn Co.,* 21 Cal.4th 383, 398 fn. 3, 87 Cal.Rptr.2d 453, 981 P.2d 79 (1999) and *Jolly v. Eli Lilly & Co.,* 44 Cal.3d 1103, 1112, 245 Cal.Rptr. 658, 751 P.2d 923 (1988)).  In this case, Britz had a reason to suspect fraud, if any, on the part of Nationwide as soon as it knew the umbrella policy did not contain the E&O coverage it alleges Nationwide represented it would contain.  That was 2002 or 2003.  Accordingly, the three-year limitations period expired by 2006.  Nothing in the January 29, 2009 tolling agreement executed by the parties retroactive to October 29, 2008, serves to revive the limitations periods for causes of action time barred prior to the date of the agreement.  In fact, the agreement expressly provides "tolling . . . is prospective only and does not waive any defense to any claims that may otherwise be barred as of the effective date of this agreement due to a statute of limitations defense."

Britz further contends, apparently in the alternative, that the reformation claim was nonetheless timely due to the application of equitable estoppel.  In particular, Britz contends

---

[2] The Court may cite unpublished California appellate decisions as persuasive authority. *Employers Ins. of Wausau v. Granite State Ins. Co.,* 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003).

Nationwide is equitably estopped from relying on a statute of limitations defense because Natiowide's actions misled Britz into believing there would be E&O coverage for the Skouti Action under the umbrella policy and that it would be unnecessary to file an action for reformation to have its indemnity claim satisfied.  Having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court finds no basis to support application of equitable estoppel.

"The doctrine of equitable estoppel is based on the theory that a party who by his declarations or conduct misleads another to his prejudice should be estopped from obtaining the benefits of his misconduct." *Kleinecke v. Montecito Water Dist.,* 147 Cal.App.3d 240, 245, 195 Cal.Rptr. 58 (1983).  "Under appropriate circumstances equitable estoppel will lie to bar a defendant from pleading the bar of the statute of limitations where the plaintiff was induced to refrain from bringing a timely action by the fraud, misrepresentation or deceptions of defendant. [Citations.] A defendant should not be permitted to lull his adversary into a false sense of security and cause of the bar of the statute of limitations to occur and then plead in defense the delay occasioned by his own conduct. [Citations.]" *Id*.  The elements of the doctrine of equitable estoppel are fourfold: " '(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. [Citations.]" *City of Goleta v. Superior Court,* 40 Cal.4th 270, 279, 52 Cal.Rptr.3d 114, 147 P.3d 1037 (2006) (*Oly Chadmar Sandpiper General Partnership* (*Sandpiper General*)) (citing *Strong v. County of Santa Cruz,* 15 Cal.3d 720, 725, 125 Cal.Rptr. 896, 898, 543 P.2d 264 (1975)).

"In the insurance context especially, estoppel may arise from a variety of circumstances in which the insurer's conduct threatens to unfairly impose a forfeiture of benefits upon the insured. Indeed, California courts have long held that 'equitable relief' may be broadly available in a proper case to relieve an insured of a forfeiture under a contractual condition of coverage. [Citations.]" *City of Hollister v. Monterey Ins. Co.,* 165 Cal.App.4th 455, 488, 81 Cal.Rptr.3d 72 (2008).  "Thus, an insurer may be estoped to assert a contractual limitations period if its conduct ' "induces the belated

filing of an action." ' [Citations.] Such a result does not require affirmative conduct or fraudulent intent by the insurer; rather, it is predicated on the insurer's failure to speak when in law or equity it is bound to so – as where it delays formal denial of a claim to complete its own investigation [citations], conceals ' "identity of the wrongdoer" ' [citations], or fails to comply with a regulatory requirement that it notify the insured of the limitations period [citation]." *City of Hollister*, at p. 488.

In support of its contention Nationwide's actions led it to believe it had E&O coverage for the Skouti action under the umbrella policy and thus refrain from timely filing an action to reform the policy to include an E&O endorsement, Britz argues, "Nationwide's initial claims adjuster, Eddie Rodriguez, opened claims for the Skouti Action under *both* the Primary Policy and the Umbrella Policy. [Citation.] Thereafter, other Nationwide adjusters and personnel handling the claims proceeded as if there was still a reasonable possibility, if not probability, that the claims would be fully covered under the Umbrella Policy. [Citations.] Indeed, Britz was assured by Michael Johnson . . . that the claim under the Umbrella Policy remained open and, to this day, is still open." Citing *Prudential-LMI Commercial Insurance v. Superior Court,* 51 Cal.3d 674, 274 Cal.Rptr. 387, 798 P.2d 1230 (1990), which held "an insurer that leads its insured to believe that an amicable adjustment of the claim will be made, thus delaying the insured's suit, will be estopped from asserting a limitation defense," *id*. at 690, Britz contends Nationwide is estopped because it induced Britz to believe that the claims arising out of the Skouti action might be fully and amicably resolved.

Not so. The record is absolutely devoid of any evidence, direct or circumstantial, to show Britz withheld filing suit to reform the umbrella policy to include an E&O endorsement in reliance on representations or conduct by Nationwide's employees indicating it might have been unnecessary to file such suit or that the Skouti claims might be fully and amicably resolved. Instead, the record reflects after Nationwide initially asserted the umbrella policy did not contain E&O coverage for the Skouti claims, it continued to maintain that position in its future correspondences with Britz. Nationwide also maintained the position Britz only had liability coverage within the limits of the commercial general liability policy. It does not appear Nationwide deviated from these positions,

19

and nothing Nationwide did or said suggested Britz might have had E&O coverage for the Skouti claims within the limits of the umbrella policy.  The evidence cited by Britz, even when viewed in the light most favorable to Britz, does not support Britz's contentions.  Britz has also provided no authority – and the Court's research reveals no authority – to support the proposition simply opening claims files and communicating with an insured about the status of the claims leads the insured to believe the claims will be amicably resolved.  If anything, the fact Nationwide repeatedly informed Britz that it had no coverage under the umbrella policy and the amounts initially demanded by Skouti and later awarded against Britz in the underlying state court action far exceeded the aggregate coverage limits in the commercial general liability policy should have led Britz to believe the claims would *not* be amicably resolved, and that Britz would have to resort to litigation against Nationwide.

Britz further contends Nationwide should be estopped from relying on a statute of limitations defense due to the actions (or more properly, omissions) of Vicki Liebe, the Nationwide employee who eventually replaced Eddie Rodriguez as the adjuster for the Skouti claims.  In support of this contention, Britz points to Liebe's deposition testimony, which appears to suggest that at one point Liebe came to believe – whether correctly or incorrectly – that the Skouti action included products liability claims and that Britz had coverage for products liability claims under both the commercial general liability and umbrella policies.  Liebe testified she did not inform Britz she believed Britz had products liability coverage.  (Liebe could not recall exactly why she did not, although she explained it might have been because she (1) "took the claim [from Rodriguez] over six months later, so coverage had, for the most part, been determined," and (2) "felt this lawsuit [(the Skouti action)] fell under the E&O endorsement [of the commercial general liability policy].")  Britz argues Liebe had an obligation to disclose the potential products liability coverage to Britz and to inform Britz that because the chemicals (i.e., products) Britz sold to Skouti might have been the proximate cause of Skouti's injuries, the Skouti claims could have been covered under the umbrella policy despite being otherwise uncovered in or excluded by the policy provisions Nationwide invoked to deny coverage.  Because she did not, the argument goes, Nationwide is estopped as a matter of law.

Problematically for Britz, a nearly identical argument was raised and rejected in *Love v. Fire Ins. Exchange,* 221 Cal.App.3d 1136, 271 Cal.Rptr. 246 (1990).   Denis and Sharon Love had a homeowners' insurance policy with Fire Insurance Exchange (FIE).   In 1981, after discovering soil movement was causing cracks in the foundation of their house, they made a claim for damages through their insurance agent.   The agent, an FIE representative, determined the damages resulted from an " 'act of god' " and denied the claim as an uncovered loss.   *Id*. at 1141.   The Loves did not pursue the matter again until 1985, when they filed a second claim after being informed the cracks were common to homes in their area and that other insurance companies had compensated other owners for similar damage.   FIE conducted an investigation and denied the claim in 1987.   The Loves sued FIE in 1988, alleging, among other things, breach of contract, breach of the implied covenant of good faith and fair dealing and fraud.   The trial court granted summary judgment in favor of FIE on statutes of limitations grounds, and the Court of Appeal affirmed.   *Id*. at 1141-42.

At the time the Loves filed their first claim with FIE, they were aware the foundation cracks were attributable not simply to soil movement but also to the negligence of the homebuilders.   *Love, supra,* 221 Cal.App.3d at 1141.   On appeal the Loves contended that because FIE stood in a fiduciary relationship with them, it had an obligation to disclose the alternative legal theory that where third party negligence was a proximate cause of the injury, an otherwise excluded loss was a covered loss. The Loves further contended FIE fraudulently concealed this theory, and that the concealment operated to estop FIE from relying on statutes of limitations.   *Id.* at 1144.   The Court of Appeal rejected this contention: "[W]e are unaware of any authority holding that an insurer is estopped to plead the statute of limitations merely because when it denied a claim it failed to inform its insured of pertinent laws or legal theories upon which the insured could rely in a later lawsuit challenging denial of the claim . . . . [¶] It is undisputed that the Loves knew the operative facts (i.e., their home was damaged and the causes of damage included third party negligence), and there is no allegation they did not possess the policy provisions outlining their rights . . . . [T]hey admit being told unequivocally in 1981 their claim was denied for lack of coverage. FIE neither 'misrepresented' nor

21

'concealed' any facts (as opposed to pertinent law or legal theories) upon which the Loves' claim was based, nor did it conceal the terms of the policy or the fact it denied the claim for lack of coverage . . . . [I]gnorance of legal theories does not toll the statute of limitations." *Id.* at 1145-46.

Explaining an insurer-insured relationship is not a true fiduciary relationship but rather a "special relationship" with certain fiduciary characteristics, *see Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 687, 254 Cal.Rptr. 211, 765 P.2d 373 (1988), the *Love* court continued: "We are unaware of any cases requiring an insurer to advise an insured of different legal theories or statutory provisions which an insured could use to avoid policy exclusions. The authorities suggest a contrary rule. 'An insurer is under no obligation to explain to the insured all possible legal theories of recovery.' [Citation.] Neither the insured's ignorance of nor the insurer's failure to explain the different legal theories upon which suit might be filed extends the time within which the insured is required to file his action. The reason that 'ignorance of legal remedy does not toll the statute of limitations' [citation] is apparent. If such argument were accepted, '. . . the practical effect would be to nullify the [statute of limitations]. "Any plaintiff could simply allege ignorance of his or her legal rights against a particular defendant. This is not difficult. Most people do not know the legal answers to questions arising from certain circumstances." [Citation.]' [Citation.] . . . [¶] . . . For these reasons we conclude FIE . . . is not estopped from raising the statute of limitations[.]" *Id.* at 1150.

*Love* relied principally on *Neff v. New York Life Ins. Co.,* 30 Cal.2d 165, 180 P.2d 900 (1947), which concluded "no mere denial of liability, even though it be alleged to have been made through fraud or mistake, should be held sufficient, without more, to deprive the insurer of its privilege of having the disputed liability litigated within the period prescribed by the statute of limitations." *Id.* at 172-73. The insured in *Neff* filed a claim in 1927 for disability benefits under the terms of his life insurance policy, which the insurer unconditionally denied. Despite being "in possession of all the facts concerning the state of his health and the extent of his disability," as well as "the policy defining his insurance rights," the insured made no further claim with the insurer. Instead, he continued paying premiums on the policy until his death in 1937. After discovering the

denial letter in 1943, the insured's son and administrator of his estate filed an action against the insurer to recover ten years' worth of disability payments. *Id*. at 166-70. At trial, judgment was entered for the insurer on statute of limitations grounds, and the California Supreme Court affirmed. On appeal the plaintiff, relying on California authority holding fraudulent concealment of a fact may operate as an estoppel, argued the insurer, "either through fraud or mistake in the interpretation of its policy, concealed the 'fact' of the insured's right to disability benefits in consequence of his submission of proof to [the insurer] in 1927, and that such conduct tolled the running of the statute of limitations upon the insured's claim until plaintiff discovered the 'misrepresentation' in 1943[.]" *Id*. at 169. The Supreme Court disagreed: "The situation here is simply one where plaintiff undertook in 1943 an inquiry which could have been made as readily by the insured as early as 1927 when defendant, by letter, first rejected his claim and thereafter consistently maintained that position of nonliability for the succeeding ten years of the insured's life without challenge on his part[.]" *Id*. at 171. Distinguishing the situation where an insurer misrepresents or conceals *facts* (which may lead to an estoppel) from the situation where an insurer misrepresents or conceals *coverage* (essentially the circumstances before it), the court reasoned: "Here, there is no comparable factor of deception involved, as [the insurer] concealed no fact but plainly stated that it denied liability upon the insured's disability claim . . . . [¶] . . . [These] acts cannot be relied upon to bring plaintiff within the rule mentioned for that would mean that no insurer could deny liability without indefinitely suspending the running of the statute of limitations until perchance the insured, or his heirs after death, might obtain at some future time legal advice indicating the view that liability existed." *Id.*

The California Supreme Court's more recent decision in *Vu v. Prudential Property & Casualty Ins. Co.,* 26 Cal.4th 1142, 113 Cal.Rptr.2d 70, 33 P.3d 487 (2001) (*Vu*), which reaffirmed the holding in *Neff* upon certified question from the Ninth Circuit, is instructive as to when an estoppel may arise. Peter Vu had a homeowner's insurance policy with Prudential Property & Casualty Insurance Company (Prudential) that included an endorsement for earthquake damage covering $300,000.00 for his dwelling and $30,000.00 for appurtenant structures; a separate 10%

23

deductible applied to each coverage.  *Id.* at 1147 (citing *Vu v. Prudential Property & Cas. Ins. Co.,* 172 F.3d 725, 727 (9th Cir. 1999)).  In accordance with California Insurance Code section 2071, Vu's policy contained a one-year suit clause providing " '[n]o action can be brought unless . . . the action is started within one year after the date of loss.' "  *Id.*  Within days of the January 17, 1994 Northridge earthquake, Vu contacted Prudential to report his house had suffered observable damage.  A Prudential adjuster inspected Vu's house and informed him he was entitled to $2500 for damage to appurtenant structures but that the damage was only $3962.50, an amount significantly below the $30,000 deductible.  On January 30, 1994, Prudential paid Vu for the appurtenant structure damage.  Vu discovered additional damage to his house in August 1995, and in September 1995, an appraiser hired by Vu estimated the earthquake damage far exceeded the deductible.  Vu promptly informed Prudential and requested coverage for this newly discovered damage.  Prudential declined on the ground that the one-year statute of limitations on actions for recovery of claims had expired.  *Ibid.*

Two and a half years after Prudential had resolved Vu's original claim, but less than a year after Vu discovered the additional damage, Vu filed suit in federal district court for breach of contract and bad faith.  *Vu, supra,* 26 Cal.4th at 1147-48 (citing *Vu v. Prudential Property & Cas. Ins. Co.,* 172 F.3d 725, 728 (9th Cir. 1999)).  Vu alleged Prudential was estopped from invoking the one-year statute of limitations because his failure to bring an action within one year was the direct result of his reasonable reliance on Prudential's January 1994 inspection and Prudential's representation the damage to his home fell below the $30,000 deductible.  *Id.* at 1148.  The district court granted summary judgment in favor of Prudential, concluding the claims were time barred. *Id.*  On appeal the Ninth Circuit certified the following question to the California Supreme Court: "When an insured presents a timely claim to his insurer for property damage under a policy, and the insurer's agent inspects the property but does not discover the full extent of covered damage, does California Insurance Code § 2071 bar a claim brought by the insured more than one year after the damage was sustained but within one year of his discovery of the additional damage?"  *Id.* at 1145.

The Supreme Court answered the question in the negative.  Reaffirming *Neff's* holding "a

denial of coverage, even if phrased as a 'representation' that the policy does not cover the insured's claim, or words to that effect, offers no grounds for estopping the insurer from raising a statute of limitations defense," *Vu, supra,* 26 Cal.4th at 1152, the Supreme Court found *Neff* did not control the circumstances before it: "Here the undisputed representation is one of fact.  William Leggitt, Prudential's inspector, examined Vu's property after the earthquake, and provided Vu with a worksheet showing the specific items of damage and the cost of repairs.  Leggitt then explained to Vu that the total cost of repairs, $3,962.50, was less than the policy's deductible amount of $30,000. Leggitt's worksheet and explanation did not merely convey a denial of coverage, or state Prudential's interpretation of the policy.  Leggitt communicated specific facts describing the nature and amount of damage, and he advised Vu not to file a claim because the total damage Vu had incurred was less than the policy's deductible. [¶] On these facts, Prudential may be estopped from raising a statute of limitations defense if Vu can show that he reasonably relied on Liggett's representation."  *Ibid*.

Nationwide, by contrast, is not alleged to have misrepresented or concealed any *facts* about the Skouti claim of which Britz could conceivably have been unaware.  Nor has Britz pointed to evidence suggesting any such misrepresentation or concealment.  The evidence, even when viewed in the light most favorable to Britz, suggests Nationwide – as with the defendant insurers in *Love* and *Neff* – might have (merely) misrepresented or concealed the extent of the *coverage* Britz possessed and failed to inform Britz about the legal theories (in this case, the theory of products liability coverage) upon which Britz could have relied to challenge Nationwide's denial of coverage under the umbrella policy.  These actions cannot create an estoppel as a matter of law.  Based on the foregoing, summary adjudication of the reformation cause of action shall be granted for Nationwide.

***2. Statute of limitation for declaratory relief –*** Nationwide further contends Britz's second through fourth causes of action for declaratory relief are time barred, whereas Britz contends they are not. Declaratory relief, like reformation, is technically not a cause of action but a remedy (i.e., a request for relief) premised on an underlying claim.  Accordingly, "the statute of limitations governing a

request for declaratory relief is the one applicable to an ordinary legal or equitable action based on the same claim." *Mangini v. Aerojet-General Corp.,* 230 Cal.App.3d 1125, 1155, 281 Cal.Rptr. 827 (1991) (citing *Maguire v. Hibernia Savings & Loan Soc.,* 23 Cal.2d 719, 733, 146 P.2d 673 (1944)).

If the causes of action for declaratory relief were premised solely on Britz's claim for reformation of the umbrella policy, the Court would be compelled to agree with Nationwide declaratory relief is time barred.   Problematically for Nationwide, Britz also seeks judicial declarations pursuant to its two non-reformation theories – namely, that it had coverage for the Skouti action under the as-issued umbrella policy and/or the August 31, 2001 quote prepared by Nationwide and accepted by Britz.   Britz's claim Nationwide was obligated to indemnify it for the Skouti judgment under these theories but failed to do so is, at its core, a claim for breach of contract.

The statute of limitations is four years for a cause of action based on an alleged breach of contract, Cal. Code Civ. Proc., § 337, and generally "a cause of action for breach of contract accrues at the time of breach, which then starts the limitations period running."   *Cochran v. Cochran,* 56 Cal.App.4th 1115, 1120, 66 Cal.Rptr.2d 337 (1997).   Because Britz alleges a breach of the duty to indemnify, its claim for declaratory relief premised on a breach of this duty would not have begun to accrue until such time the duty could conceivably have first arisen and Nationwide declined to fulfill it.   Unlike the duty to defend, which "arises if facts alleged in the complaint, or other facts known to the insurer, potentially could give rise to coverage under the policy," *Legacy Vulcan Corp. v. Superior Court,* 185 Cal.App.4th 677, 110 Cal.Rptr.3d 795 (2010) (emphasis omitted), the duty to indemnify "arises only when the insured's underlying liability is established." *Pardee Const. Co. v. Insurance Co. of the West,* 77 Cal.App.4th 1340, 1350, 92 Cal.Rptr.2d 443 (2000).   The Court further notes the umbrella policy provides in pertinent part, "We will pay on behalf of the insured the ultimate net loss which the insured shall become *legally obligated to pay*, in excess of the underlying limit or retained limit because of bodily injury, property damage, personal injury or advertising injury to which this insurance applies."   (Emphasis added.)   Under both the general principle applicable to the duty to indemnify and the language of the umbrella policy, it is clear

26

1   Nationwide's duty to indemnify Britz, if any, was contingent upon the success of the Skouti action.

2   Britz's underlying liability was not established, and it could not have been legally obligated

3   to pay the Skouti award, until the Skouti action resulted in a "judgment" – that is, a "final

4   determination of the rights of the parties in an action or proceeding." Cal. Code Civ. Proc., § 577.

5   The trial court entered a final and appealable judgment against Britz in the Skouti action on April

6   14, 2005. Accordingly, Nationwide's duty, if any, to indemnify Britz under the umbrella policy or

7   the contract that might have been formed by Britz's acceptance of the August 31, 2001 quote arose

8   at that time.  An insurer cannot breach a duty to pay policy benefits until the duty has actually arisen.

9   Therefore, Britz's breach of contract claim could not have accrued any earlier than April 14, 2005.[3]

10   Ordinarily, then, the applicable four-year statute of limitations would have expired by April

11   14, 2009.  However, the judgment was appealed and not affirmed until July 6, 2007, more than two

12   years after it was originally entered.  The limitations period for a breach of contract claim against an

13   insurer is equitably tolled while an appeal in the underlying action is pending.  *See Archdale v.*

14   *American Intern. Specialty Lines Ins. Co.,* 154 Cal.App.4th 449, 476-79, 64 Cal.Rptr.3d 632 (2007).

15   Consequently, the limitations period in this case was tolled from the filing of the notice of appeal

16   to July 6, 2007.  The record does not reveal when the appeal was filed, but the California Rules of

17   Court provide in pertinent part that, subject to exceptions not applicable here, "a notice of appeal

18   must be filed on or before the earliest of: [¶] (A) 60 days after the superior court clerk serves on the

19   party filing the notice of appeal a document entitled 'Notice of Entry' of judgment or a file-stamped

20   copy of the judgment, showing the date either was served; [¶] (B) 60 days after the party filing the

21   

22   [3] Although Britz's breach of contract claim could not have accrued any earlier than April 14,
     2005, the claim could conceivably have accrued *after* April 14, 2005, as the duty to indemnify is not

23   breached simply because an insurer refuses to pay policy benefits.  Rather, the statute of limitations

24   for such a claim begins to run only upon the insurer's unconditional denial of the insured's request
     for indemnification.  *See Park v. First American Title Ins. Co.,* 2011 WL 1991651 (Cal.App. 4 Dist.

25   2011) (unpublished), at *5 (citations, quotations omitted).  The parties appear to dispute the exact
     date Nationwide unconditionally denied benefits.  Nevertheless, because the Court concludes Britz's

26   claim is timely using an April 14, 2005 accrual date, and the claim could not have accrued earlier

27   than April 14, 2005, the Court need not determine when the unconditional denial occurred here.

28   27

notice of appeal serves or is served by a party with a document entitled 'Notice of Entry' of judgment or a file-stamped copy of the judgment, accompanied by proof of service; or [¶] (C) 180 days after entry of judgment." Cal. Rules of Court, rule 8.104(a)(1). Even assuming the notice of appeal was filed as late as 180 days after the judgment was entered, meaning six months of the limitations period had already transpired by the time the limitations period became tolled due to the pendency of the appeal, Britz still had as much as three years and six months after July 6, 2007 to bring a timely cause of action against Nationwide for declaratory relief premised on an alleged breach of contract.

As noted above, the parties executed a tolling agreement on January 29, 2009 retroactive to October 29, 2008, just under sixteen months after July 6, 2007. The tolling agreement provided in pertinent part, "The running of any statute of limitations with respect to all claims, demands, actions and causes of action which either party herein has or may have against the other, arising out of or relating to the Skouti Issues . . . [is] tolled from October 29, 2008 to and including one (1) month following the conclusion of the Bayer Action in the U.S. District Court." The "Bayer Action" refers to *Britz Fertilizers, Inc. v. Bayer Corporation* (Eastern District case no. 1:06-cv-00287-OWW-DLB), an action brought by Britz against the manufacturer of Ethrel, a synthetic growth regulator and one of the chemicals allegedly sold by Britz to Skouti and applied to Skouti's crops. That action concluded on December 16, 2010. Britz filed the subject action on November 4, 2010, while the tolling agreement was in effect and no fewer than twenty-six months of the applicable limitations period were still remaining. Britz's declaratory relief causes of action are therefore not time barred.

*3. Statute of limitations for breach of contract* – Nationwide further contends Britz's fifth cause of action for breach of insurance contract is time barred; Britz contends it is not. Consistent with the Court's analysis above of the statute of limitations for declaratory relief premised on an alleged breach of contract, the Court finds the cause of action for breach of insurance contract to be timely.

*4. Statute of limitations for bad faith* – Nationwide further contends Britz's sixth cause of action

for insurance bad faith (i.e., breach of the implied covenant of good faith and fair dealing) is untimely, whereas Britz contends it is not.  A claim for contractual breach of the implied covenant of good faith and fair dealing is generally governed by a four-year statute of limitations.  *See* Cal. Code Civ. Proc., § 337, subd. (1); compare Cal. Code Civ. Proc., § 339 (two-year limitations period for tort actions, including tortious breaches of the implied covenant).  Consistent with the analysis of the statute of limitations for declaratory relief premised on an alleged breach of contract, Britz's cause of action for bad faith would be timely filed assuming the four-year limitations period applied.

The claim would be timely even if the two-year limitations period applied.  "[T]he statute of limitations on a bad faith claim 'accrues whenever the insurer unreasonably withholds policy benefits due the insured by formally denying the claim.' [Citation.]"  *Park, supra,* 2011 WL 1991651 at *5.[4]  As noted above, indemnification, if any, for the Skouti award could not have been due Britz until the trial court entered judgment in the Skouti action.  That was April 14, 2005.  Thus, Britz's claim of a bad faith failure to pay policy benefits could not have accrued earlier than April 14, 2005.

As further noted, the judgment was appealed and not affirmed until July 6, 2007, more than two years after it was originally entered.  The limitations period for a bad faith claim against an insurer, as with a claim for breach of contract, is equitably tolled while an appeal in the underlying action is pending.  *See Archdale v. American Intern. Specialty Lines Ins. Co.,* 154 Cal.App.4th 449, 476-79, 64 Cal.Rptr.3d 632 (2007).  Consequently, the limitations period for a bad faith claim was tolled from the filing of the notice of appeal to July 6, 2007.  Even assuming the notice of appeal was filed as late as 180 days after judgment was entered (the latest possible time under California Rules of Court, rule 8.104), meaning six months of the limitations period had already transpired by the time the limitations period became tolled due to the pendency of the appeal, Britz still had as much as a year and a half after July 6, 2007 to bring a timely cause of action against Nationwide for bad faith.

Again, the parties executed a tolling agreement on January 29, 2009 retroactive to October

---

[4] The Court may cite unpublished California appellate decisions as persuasive authority. *See Employers Ins. of Wausau v. Granite State Ins. Co.,* 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003).

29, 2008, just under sixteen months after July 6, 2007.  The tolling agreement provided in pertinent part, "The running of any statute of limitations with respect to all claims, demands, actions and causes of action which either party herein has or may have against the other, arising out of or relating to the Skouti Issues . . . [is] tolled from October 29, 2008 to and including one (1) month following the conclusion of the Bayer Action in the U.S. District Court."  The Bayer action concluded on December 16, 2010.  Britz filed the subject action on November 4, 2010, while the tolling agreement was in effect and no fewer than two months of the two-year limitations period would have remained.[5]

**5. Statute of limitations for fraud** – Nationwide further contends Britz's seventh cause of action for fraud is untimely, whereas Britz contends it is not.  Under this cause of action, Britz, incorporating previous allegations by reference, alleges, "Nationwide intentionally misrepresented to Britz (but later denied) that Ag E&O coverage was contained in the 'following form' Umbrella Policy."  Britz further alleges, "Nationwide intentionally concealed from Britz that the Skouti Action was covered under Products/Completed Operations provisions of the CGL Policy and under the Umbrella Policy."

Inasmuch as Britz intends to allege fraud against Nationwide for falsely representing the umbrella policy would include E&O coverage when it ultimately did not, the claim is *not* time barred.  This is true despite the fact the Court already found Britz's cause of action for reformation premised on fraud *is* time barred.  To explain why, the Court must first explain the difference between a cause of action for reformation premised on fraud and a cause of action for fraud itself.

As noted above, "when a claim seeks only reformation, the essential elements of the 'claim' which must be pled are: (1) the 'real' agreement the parties intended but failed to execute; (2) the form of the agreement or other instrument that was actually reduced to writing; and (3) the grounds for reformation, whether fraud or mistake, and how it came about."  *Save Tara v. City of West*

---

[5] Britz did not assert a cause of action for bad faith until the filing of its first amended complaint on October 28, 2011.  However, the Court finds the first amended complaint rested on the same general set of facts, involved the same injury and referred to the same instrumentality as – and therefore related back to – the original complaint.  *See Norgart, supra,* 21 Cal.4th at 408-409.

*Hollywood,* 2009 WL 1451634 (Cal.App. 2 Dist. 2009) (unpublished), at *6 (citations omitted).[6] Critically, "[t]he plaintiff need not prove breach or damages." *Id*. Thus, a cause of action for reformation premised on fraud accrues, like the Court concluded above, as soon as the party seeking reformation is aware the agreement did not reflect the parties' intent because there had been a misrepresentation. By contrast, "[t]he elements of common law fraud in California are: (1) a misrepresentation of a material fact (false representation, concealment or nondisclosure); (2) knowledge of falsity; (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting *damage*." *Collins v. eMachines, Inc.,* 202 Cal.App.4th 249, 259, 134 Cal.Rptr.3d 588 (2011) (citing *Robinson Helicopter Co., Inc. v. Dana Corp.,* 34 Cal.4th 979, 990, 22 Cal.Rptr.3d 352, 102 P.3d 268 (2004)) (emphasis added). It is the inclusion of the fifth and final element – namely, damage – that results in an entirely different accrual date for Britz's fraud cause of action.

Consistent with the Court's analysis above of the statute of limitations for reformation premised on fraud, the evidence shows that possibly as early as 2002, but in any event no later than 2003, Britz was aware of facts that should have led it to suspect fraudulent wrongdoing on the part of Nationwide. Again, the limitations period for reformation is three years. *See* Cal. Code Civ. Proc., § 338, subd. (d). Therefore, Britz had at most until 2006 to file a timely claim for reformation premised on fraud, which it did not. Britz's fraud claim, on the other hand, did not accrue in 2003, because under California law, the last element necessary for fraud – damage to Britz – had not yet occurred. Rather, it accrued in 2005, upon entry of judgment against Britz in the underlying action.

*Butcher v. Truck Insurance Exchange,* 77 Cal.App.4th 1442, 92 Cal.Rptr.2d 521 (2000), is instructive on this issue. In 1985, Truck Insurance Exchange (Truck) agent Don Meyer contacted Dan Butcher to solicit insurance business. *Id*. at 1447. Butcher gave Meyer copies of his current policies with other insurers, which were not being renewed, and instructed Meyer to secure the same coverage but with higher limits. One policy Butcher provided to Meyer, written by West American

---

[6] Again, the Court may cite unpublished California appellate decisions as persuasive authority. *Employers Ins. of Wausau, supra,* 330 F.3d at 1220 n. 8.

Insurance Company (West American), included personal injury coverage defined as injury arising out of, among other things, malicious prosecution.  According to Butcher, Meyer said he could obtain the coverage Butcher wanted, and he later came to Butcher's office with the policy he obtained from Truck indicating it had the same coverage as that provided by the West American policy.  However, Meyer never told Butcher he was unable to procure personal injury coverage.  *Id*. According to Meyer, Truck did not provide personal injury coverage to contractors like Butcher, but he presented the policies Butcher had provided to Truck's underwriter, Robert White, and asked White whether he could make an exception for Butcher and duplicate the West American coverage. White declined to write personal injury coverage, and Meyer so informed Butcher.  *Id*. at 1447-48.

Meyer delivered the Truck policy, naming Butcher and his wife as insureds, in May 1986. *Butcher, supra,* 77 Cal.App.4th at 1448.  The initial policy period was from October 1, 1985 to October 1, 1986, although Truck continued to renew Butcher's policy until November 6, 1992.  *Id*.

In 1977, Butcher had contracted to sell real property to James Hennefer and Robert Klein. *Butcher, supra,* 77 Cal.App.4th at 1448.  After Butcher cancelled the escrow, Hennefer and Klein sued Butcher for specific performance and obtained a judgment in their favor in 1986.  Between 1986 and 1990, Butcher and his wife prosecuted four lawsuits, together and separately, against Hennefer and others with the aim of avoiding execution and delivery of a deed of trust to the property as required by the specific performance judgment.  Hennefer and others responded with a malicious prosecution action against the Butchers in 1992.  In connection with that action, the Butchers sought a defense and indemnification from Truck, West American and a third insurer, Continental Insurance Company (Company).  When Truck declined to defend, the Butchers hired their own attorneys.  In 1995, the malicious prosecution plaintiffs obtained a judgment against the Butchers in the amount of $16,811,200 plus punitive damages against Butcher individually in the amount of $3 million.  (The Butchers claimed to have settled that action on appeal.)  *Id*. at 1448-49.

In 1994, the Butchers filed an action against Truck for breach of contract, bad faith, declaratory relief and reformation of the insurance policy, against Truck and Meyer for negligent

32

misrepresentation and failure to procure adequate liability insurance coverage, and against Meyer for breach of contract to procure insurance. *Butcher, supra,* 77 Cal.App.4th at 1449. The Butchers alleged that as policyholders, they were owed a defense and indemnification in the malicious prosecution action. Truck and Meyer moved for summary judgment, arguing in part that the claims for negligent misrepresentation (a species of fraud) and failure to procure insurance (essentially negligence) were barred by the applicable statutes of limitations. *Id*. at 1449-50. The trial court granted summary judgment and the Court of Appeal reversed. On appeal, Truck and Meyer contended the claims at issue accrued as soon as the Truck policy was delivered to the Butchers in May 1986, the implication presumably being that the Butchers knew or should have known right then and there that the policy did not contain the personal injury coverage Dan Butcher alleged Meyer represented it would contain. From this, Truck and Meyer argued that because the Butchers did not file their complaint until 1994, in excess of any limitations period that could conceivably have applied, the claims were time barred. The Butchers, conversely, argued they were not damaged – and their claims did not accrue – until Truck refused to provide a defense in the malicious prosecution action. That case was filed and its defense tendered to Truck in 1992, with Truck informing the Butchers in 1993 it would not defend them. From this, the Butchers argued the 1994 filing of the complaint was timely. The Court of Appeal agreed with the Butchers. The court reasoned: "[A]lthough Meyer delivered the Truck policy that did not conform with his promise in 1986, the fact of any damage at all was completely uncertain until Truck told [the Butchers] it would not defend them in the [malicious prosecution] action. Until the malicious prosecution action was filed and served, and [the Butchers] were required to defend, whether the omission of personal injury coverage would harm them at all was a mere possibility. That remained the case until Truck refused to defend the [malicious prosecution] action, which occurred April 1, 1993, and [the Butchers] filed suit against Truck and Meyer in October 1994, less than two years later . . . . We conclude that the statutes are not shown to have run as a matter of law." *Butcher, supra,* 77 Cal.App.4th at 1467-68.

*Butcher* relied in large part on *Walker v. Pacific Indemnity Company,* 183 Cal.App.2d 513,

6 Cal.Rptr. 924 (1960).  The facts of *Walker* are as follows.  On March 17, 1952, Merrill ordered an insurance policy covering operation of his logging truck with limits of $50,000 for bodily injury to one person.  His broker, Fulmore, accepted the order but secured a policy with limits of only $15,000.  On July 9, 1952, Merrill's truck collided with another automobile, injuring Elaine Walker.  Walker later sued Merrill and, on December 16, 1955, obtained a jury verdict for $100,000.  Pacific Indemnity Company (Pacific) paid $15,000 plus costs and interest.  *Id.* at 515.  Merrill then assigned his rights against Fulmore to Walker, who brought an action against Fulmore on December 14, 1956, alleging Fulmore " 'negligently and carelessly' " procured coverage of $15,000 rather than $50,000.  Pacific was joined as a defendant on the theory that Fulmore, as its agent, had obligated it to issue the larger policy.  A verdict was rendered in favor of Pacific but against Fulmore for $35,000.  Walker did not appeal the judgment for Pacific, but Fulmore appealed the judgment against him. *Id*.

On appeal Fulmore contended the action was barred by the applicable statutes of limitations, an argument he had asserted in various pre-trial and trial motions.  *Walker, supra,* 183 Cal.App.2d at 515.  Specifically, Fulmore contended the action accrued on March 17, 1952 (when he procured the policy for Merrill) or, at the latest, on July 9, 1952 (when the accident occurred), meaning Walker's December 14, 1956 filing of the action was untimely.  Walker contended the action was timely because it did not accrue until December 16, 1955, when the $100,000 verdict against Merrill (to whose rights she had succeeded) was returned.  The Court of Appeal agreed with Walker.  *Ibid*.

"The parties agree that both wrong or breach of duty and injury or damage are essential to the accrual of a cause of action.  There is no dispute that the wrong here occurred March 17, 1952, when [Fulmore] 'negligently and carelessly' procured a policy with limits of $15,000, rather than $50,000.  [¶]  But was there any injury or damage then?  We think not."  *Walker, supra,* 183 Cal.App.2d at 515-16.  The court explained: "It is true that Merrill then received less than he had ordered.  But it is difficult to conceive what action he could then have brought . . . .  Until an accident occurred, bodily injury was inflicted on another, and a liability in excess of the $15,000 coverage incurred, there was no injury to Merrill in the absence of possible special facts which do not appear

34

here." *Id*. at 516.  Observing Merrill could have insured against the contingency of personal injury (presumably with another insurer) prior to the accident, but that he obviously could not after the accident occurred, the court further explained: "When the complaint in the personal injury action was filed . . . he knew only that he was exposed to a liability in excess of $15,000.  It is true that he had then suffered a loss of security or protection, but whether that loss would constitute any ultimate injury or damage remained to be determined.  Unless he showed that his credit rating was adversely affected by the mere existence of the unindemnified liability, or that some other special situation imposed present damage, he had not yet suffered a loss which would sustain an action against the broker.  It is perhaps true he could have filed an action for declaratory relief, but a principal function of that statutory relief is to permit declaration of rights and duties before actual loss occurs." *Ibid*.

The *Walker* court continued: "At that stage, Merrill had incurred no recoverable loss.  He had merely suffered an exposure to liability beyond his insurance coverage – a mere possibility that he might suffer liability beyond the indemnity afforded him.  The lesser coverage afforded him defense of the claim against him, and he was not injured by being required to provide or incur liability for such defense.  Beyond this right to be defended, his insurance policy was a mere indemnity agreement, a contract to pay a liability which might be imposed upon him.  Whether a deficiency in the amount of that indemnification injured him depended wholly upon determination of the amount of liability to which the indemnity applied.  Whether liability would be imposed, and if so, whether it would result in loss by exceeding his indemnification, was to be determined by the uncertainties of the personal injury litigation." *Walker, supra,* 183 Cal.App.2d at 516-17.  From this, the court concluded: "It is clear that mere possibility, or even probability, that an event causing damage will result from a wrongful act does not render the act actionable. [Citations.] . . . [U]ncertainty as to the fact of damage, rather than its amount, [ ] negatives the existence of a cause of action. [Citations.] In the case at bar, the fact of any damage at all was completely uncertain until judgment in the personal injury action. [¶] . . . [¶] . . . [T]he shortage of liability insurance coverage exposed plaintiff's assignor, the insured, to possible liability in excess of his indemnification.  But exposure

to and imposition of liability are vastly different matters. Until judgment in the personal injury action, no liability was imposed upon the insured as to which he could allege a cause of action against the broker from whom he had ordered indemnity in excess of that furnished." *Id.* at 1517-19.

The same is true here. Britz paid policy premiums in reliance on Nationwide's alleged misrepresentations, but it suffered no harm at the time. While Britz received less coverage than it believed it had purchased, there was no tangible injury to Britz until the Skouti action resulted in a judgment imposing liability in excess of the actual coverage; whether Britz would be harmed by the lack of E&O coverage in the umbrella policy was therefore purely speculative until that occurred. In fact, like the insurer in *Walker*, who agreed to defend its insured under a lesser policy than the insured had requested, it appears Nationwide accepted Britz's tender of a defense under the commercial general liability policy and further agreed to enhance the aggregate E&O limits in that policy from $1 million to $2 million in exchange for payment of an additional premium by Britz. The absence of E&O coverage in the umbrella policy would not have caused Britz any harm had Britz not incurred an adverse judgment exceeding the commercial general liability coverage limits.

In continuing to argue Britz's fraud claim accrued as soon as Britz became aware in 2002 or 2003 that Nationwide might have made a misrepresentation – regardless of the fact that under the holdings of *Butcher, Walker* and similar cases, *see, e.g., Williams v. Hilb, Rogal & Hobbs Insurance Services of California, Inc.,* 177 Cal.App.4th 624, 98 Cal.Rptr.3d 910 (2009), Britz suffered no compensable injury as a matter of law until the Skouti judgment was entered against it in 2005 – Nationwide evinces a fundamental misunderstanding of statutes of limitations in general and of the discovery rule in particular. Again, with limited exceptions, "the statute of limitations runs from the occurrence of the last element essential to the cause of action." *Aryeh, supra,* 55 Cal.4th at 1191 (internal citations, quotations omitted). Injury to Britz, the last element essential to Britz's fraud cause of action, occurred in 2005. The discovery rule, "which delays accrual of a cause of action until a party discovers or has reason to discover the cause of action," *Full v. First Franklin Financial Corporation,* _Cal.Rptr.3d_, 2013 WL 2326729 (Cal.App. 3 Dist. 2013), at *4, does not alter the

36

general rule of accrual.  The discovery rule may be invoked to *postpone* the running of the statute of limitations where a cause of action would otherwise have accrued under the general rule if the plaintiff did not suspect and could not reasonably have discovered that the cause of action resulted from wrongdoing.  *See Fox, supra,* 35 Cal.4th at 803.  But Nationwide has provided no authority – and the Court's research reveals no authority – to support the proposition that the rule may be invoked to "jumpstart" the limitations period when all the elements essential to the cause of action have not yet occurred.  Nationwide essentially attempts to jumpstart the limitations period in this case by contending the fraud claim accrued once Britz discovered "facts sufficient to make a reasonably prudent person suspicious of fraud," *Bedolla v. Logan & Frazer,* 52 Cal.App.3d 118, 130, 125 Cal.Rptr. 59 (1975), even though no injury to Britz had even occurred.  Problematically for Nationwide, while "the discovery rule may extend the statute of limitations, [ ] it cannot decrease it."  *Cleveland v. Internet Specialties West, Inc.,* 171 Cal.App.4th 24, 32, 88 Cal.Rptr.3d 892 (2009).

One might argue, reasonably, that Britz's claim accrued once it suspected there had been a misrepresentation because there were remedies Britz could immediately have sought – for example, cancellation of the insurance policy and restitution of premiums.  The Court does not necessarily disagree with this sentiment, but California courts do.  The plaintiff municipality in *City of Vista v. Robert Thomas Securities, Inc.,* 84 Cal.App.4th 882, 101 Cal.Rptr.2d 237 (2000), had purchased two security instruments, known as Small Business Administration interest-only strips, in 1990.  *Id*. at 884.  Five years later, the municipality sued the brokerage from whom it had purchased the strips, asserting various fraud theories.  The evidence showed that by September 6, 1990, the municipality's treasurer had decided the strips were not a proper investment for the municipality and had asked the broker-dealer to return the money he had been paid for the strips.  On October 25, 1990, the treasurer wrote to the president of the brokerage asking for his help in rescinding the transactions due to the broker-dealer's misrepresentation of the nature of the strips.  And on October 18, 1991, the treasurer wrote a letter to another securities dealer allegedly involved in the transactions and demanded restitution for one of the strips, stating his analysis indicated " 'price collusion existed among

securities dealers in a direct attempt to defraud' " the municipality. *Id.* at 885.  The trial court granted summary judgment in favor of the brokerage on statute of limitations grounds, finding the municipality (1) had discovered the investments were improper by September 6, 1990 and (2) knew it had suffered pecuniary damage by October 18, 1991.  The Court of Appeal reversed. *Id.* at 885-86.

Observing that for accrual purposes "damage must be actual monetary loss," the court concluded there was a triable issue of fact when the municipality suffered monetary loss by virtue of the broker-dealer's alleged misrepresentations.  *Robert Thomas Securities, Inc., supra,* 84 Cal.App.4th at 887.  The court found the municipality would not have suffered monetary loss had it received interest payments on the strips sufficient to cover its initial investment and provide a reasonable return, and that the evidence showed it might not have been possible to determine what the ultimate return on the strips would have been until 1994, several years after they were purchased. *Id*.  The court further rejected the brokerage's argument, as relevant here, that the municipality should not be permitted to sit on its right to sue until the point it incurred damage because it had the right to rescind the transactions as soon as it learned of the fraud.  *Id*. at 888.  "[The municipality] has the right to elect its remedy.  'When a party learns that he has been defrauded, he may, instead of rescinding, elect to stand on the contract and sue for damages, and in such case his continued performance of the agreement does not constitute a waiver of his action for damages.' [Citation.] In this case, [the municipality] elected to sue for fraud instead of rescission." *Id*. at 889.  Similarly, Britz had the option of suing for cancellation/restitution once it suspected a misrepresentation or waiting until the underlying action concluded and suing for fraud damages.  Britz opted for the latter.

In sum, Britz did not suffer damage – and its cause of action for fraud did not begin to accrue – until the trial court entered a judgment against Britz in the Skouti action on April 14, 2005.  Again, that judgment was appealed and not affirmed until July 6, 2007, more than two years after it was originally entered.  The Court further concludes that, under the reasoning of *Archdale, supra,* 154 Cal.App.4th 449, the limitations period for Britz's fraud claim against Nationwide, as with its claims for breach of contract and bad faith, was equitably tolled while the appeal in the underlying action

was pending. "[R]esulting damages cannot be certain until the judgment is final or the time in which to appeal has passed. This is so because if the insured appeals a trial court judgment in favor of a third party claimant for damages that exceed the insurer's policy limit, that appeal may result in a reversal of the judgment against the insured, or a modification of the judgment that reduces damages to an amount below the policy limit. Thus, until the judgment is final it cannot be determined with certainty whether, and in what amount, the insured has been harmed. [Citation.] As a result, the limitations period necessarily should be immediately tolled until the finality of the excess judgment . . . . [W]hile an insured might file an action . . . upon *entry* of the excess judgment, the insured is also entitled to await *finality* before bringing his action and, pending such finality, the running of the limitations period is tolled." *Archdale, supra,* 154 Cal.App.4th at 478 (emphasis original). *Archdale* addressed only the statutes of limitations for breach of contract and breach of the implied covenant of good faith and fair dealing, not fraud, but the Court cannot envision why the foregoing reasoning would not be equally applicable to a fraud claim. Consequently, the three-year limitations period for a fraud claim was tolled from the filing of the notice of appeal to July 6, 2007. Even assuming the notice of appeal was filed as late as 180 days after judgment was entered (the latest possible time under California Rules of Court, rule 8.104), meaning six months of the limitations period had already run by the time the limitations period became tolled due to the pendency of the appeal, Britz still had as much as two and a half years after July 6, 2007 to bring a timely cause of action for fraud.

Again, the parties executed a tolling agreement on January 29, 2009 retroactive to October 29, 2008, just under sixteen months after July 6, 2007. The tolling agreement provided in pertinent part, "The running of any statute of limitations with respect to all claims, demands, actions and causes of action which either party herein has or may have against the other, arising out of or relating to the Skouti Issues . . . [is] tolled from October 29, 2008 to and including one (1) month following the conclusion of the Bayer Action in the U.S. District Court." The Bayer action concluded on December 16, 2010. Britz filed the subject action on November 4, 2010, while the tolling agreement was in effect and no fewer than fourteen months of the applicable three-year limitations period would

have remained.[7]  Accordingly, to the extent Britz alleges Nationwide fraudulently represented the umbrella policy would include E&O coverage when it ultimately didn't, the claim is not time barred.

To the extent Britz alleges Nationwide intentionally concealed from Britz that the Skouti action was covered under the products-completed operations provisions of the commercial general liability and umbrella policies, the Court further finds the fraud claim timely for the same reasons.

- - -

**B. Substantive arguments** – Having concluded Britz's reformation claim is time barred but its claims for breach of contract, declaratory relief premised on breach of contract, bad faith and fraud are not, the Court now proceeds to address the parties' substantive arguments, keeping in mind the only viable theories that remain as a consequence of statutes of limitations are Britz's contentions it had coverage for the Skouti judgment under the as-issued version of the umbrella policy and/or insurance contract allegedly formed by Britz's acceptance of Nationwide's August 31, 2011 quote.

**1. Breach of contract and declaratory relief (umbrella theory)** – To this end, Nationwide contends summary adjudication of the claims for breach of contract and declaratory relief must be granted in its favor because Britz had no coverage for the Skouti judgment under the umbrella policy.  Britz, conversely, contends summary adjudication must be granted in its favor because there was coverage.

"[I]nterpretation of an insurance policy is a question of law," and "[w]hile insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply."  *Palmer v. Truck Ins. Exchange,* 21 Cal.4th 1109, 1115, 90 Cal.Rptr.2d 647, 988 P.2d 568

---

[7] Britz did not assert a cause of action for fraud until the filing of its second amended complaint on July 27, 2012.  However, the Court finds the second amended complaint rested on the same general set of facts, involved the same injury and referred to the same instrumentality as – and therefore related back to – the first amended complaint*, see Norgart, supra,* 21 Cal.4th at 408-409, which in turn related back to the original complaint.  *See* footnote 5.

40

(1999) (citations, quotations omitted).  " 'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties.  "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation.  Such intent is to be inferred, if possible, solely from the written provisions of the contract.  The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage,' controls judicial interpretation." ' " *Ameron Intern. Corp. v. Insurance Co. of State of Pennsylvania,* 50 Cal.4th 1370, 1377-78, 118 Cal.Rptr.3d 95, 242 P.3d 1020 (2010) (quoting *Waller v. Truck Ins. Exchange, Inc.,* 11 Cal.4th 1, 18, 44 Cal.Rptr.3d 370, 900 P.2d 619 (1995)) (internal citations omitted).  Accordingly, " '[the court's] goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions. [Citations.] "If [the] language [of the policy] is clear and explicit, it governs." [Citations.]' " *Minkler v. Safeco Insurance Co. of America,* 49 Cal.4th 315, 321, 110 Cal.Rptr.3d 612, 232 P.3d 612 (2010).

If the terms of an insurance policy are not clear and explicit, but "susceptible of two or more reasonable constructions," they are ambiguous.  *Ameron Intern. Corp., supra,* 50 Cal.4th at 1378. " 'If the terms are ambiguous . . . , [courts] interpret them to protect " 'the objectively reasonable expectations of the insured.' "  Only if these rules do not resolve a claimed ambiguity do [courts] resort to the rule that ambiguities are to be resolved against the insurer." *Minkler, supra,* 49 Cal.4th at 321 (internal citations omitted). "To further ensure that coverage conforms fully to the objectively reasonable expectations of the insured, the corollary rule of interpretation has developed that, in cases of ambiguity, basic coverage provisions are construed broadly in favor of affording protection, but clauses setting forth specific exclusions from coverage are interpreted narrowly against the insurer." *Id.* at 322. "[An] exclusionary clause must be ' "conspicuous, plain and clear." ' [Citation.] This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded.' [Citation.]" *Palp, Inc. v. Williamsburg National Insurance Co.,* 200 Cal.App.4th 282, 290, 132 Cal.Rptr.3d 592 (2011).

"The insured has the burden of establishing the claim comes within the scope of coverage, and the insurer has the burden of establishing the claim comes within an exclusion. To prevail, the insurer must establish its interpretation of the policy is the only reasonable one. Even if the insurer's interpretation is reasonable, the court must interpret the policy in the insured's favor if any other reasonable interpretation would permit coverage for the claim." *Palp, supra,* at 200 Cal.App.4th at 290; *Montrose Chemical Corp. v. Superior Court,* 6 Cal.4th 287, 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993) ("To prevail, the insured must prove the existence of a *potential* for coverage, while the insurer must establish *the absence of any such potential.* In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot . . . .*").

"In interpreting an insurance contract, th[e] court must first look to the insuring agreement and determine whether coverage exists. If coverage exists, then th[e] court must look to the contract exclusions to see if coverage is otherwise excluded." *Stanford Ranch, Inc. v. Maryland Cas. Co.,* 89 F.3d 618, 627 (9th Cir. 1996). With respect to coverage, the umbrella policy provides as follows:

"**I.    COVERAGE**

    **A.**    We will pay on behalf of the **insured** the **ultimate net loss** which the **insured** shall become legally obligated to pay, in excess of the **underlying limit** or **retained limit** because of **bodily injury**, **property damage**, **personal injury** or **advertising injury** to which this insurance applies.

    **B.**    This insurance applies to **bodily injury** and **property damage** only if:

        1.    The **bodily injury** or **property damage** is caused by an **occurrence**;

        2.    The **bodily injury** or **property damage** occurs during the policy period; and

        3.    Prior to the policy period, no **insured** listed under Paragraph A. of Section **IV. WHO IS AN INSURED** and no **employee** authorized by the **named insured** to give or receive notice of an **occurrence** or claim, knew that the **bodily injury** or **property damage** had occurred[.]"

(Bold original.)  By the plain language of this section, Nationwide was obligated to indemnify Britz for losses Britz became legally obligated to pay due to property damage caused by an "occurrence." Nationwide now asserts Britz had no coverage under this section because the misconduct alleged in the Skouti action did not establish such an "occurrence" within the meaning of the umbrella policy.

In opposition, Britz first contends estoppel applies to preclude Nationwide from arguing the absence of an occurrence because Nationwide did not assert that argument as grounds for its reservation of rights.  Citing *Canadian Ins. Co. v. Rusty's Island Chip Co.,* 36 Cal.App.4th 491, 42 Cal.Rptr.2d 505 (1995) (*Rusty's*), Britz contends once it has accepted an insured's tender of a defense under a reservation of rights, an insurer's subsequent denial of coverage can only be based on the grounds asserted in its reservation of rights letter.  *Rusty's*, however, says nothing of the sort.

The insurer in *Rusty's* filed a declaratory relief action in state court against third party claimants who had prevailed against its insured in an underlying federal action for trademark infringement.  *Rusty's, supra,* 36 Cal.App.4th at 493-94.  The claimants filed a cross-complaint against the insurer, asserting – as Britz essentially does here[8] – the insurer had waived all coverage defenses not alleged in its reservation of rights letter to its insured.  *Id*. at 495.  Pursuant to a three-day bench trial, the trial court found the insurer's "reservation of rights [was] limited to the points listed in that letter and it 'did not properly advise its insured of the reservation of rights as to any point not mentioned in the letter.' "  *Id*. at 497-98.  The Second District held the trial court's factual finding on reservation of rights was binding on appeal because the insurer did not contend the finding was unsupported by the evidence.  From this, the appellate court was able to conclude, "[The insurer's] failure to reserve its right to contest coverage under the policy's exclusions of coverage

_____

[8] Britz expressly argues for estoppel, whereas *Rusty's* involved the issue of waiver.  Estoppel and waiver are distinct doctrines, even though the distinction is often elided in the case law.  It is clear from the pleadings, however, that Britz is advocating a "form of estoppel [that] is, for practical purposes, indistinguishable from the doctrine of implied waiver through conduct."  *Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.,* 144 Cal.App.4th 1175, 1190, 51 Cal.Rptr.3d 144 (2006) (citing *Waller, supra,* 11 Cal.4th at 31, 33-34 (" '[C]alifornia courts will find waiver when a party intentionally relinquishes a right or *when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished*' ")).

for willful acts or trademark infringement waived its right to assert those exclusions as a basis for denying coverage in the federal action." *Id*. at 498.  Problematically, the court did not review the trial court's finding, and the finding is not discussed in any detail.  As a result, it is unclear whether the appellate court reached this conclusion because the insurer's letter did not include language adequately reserving its right to deny coverage, or because the insurer reserved its rights but failed to specify the various bases for the reservation.  Furthermore, it is important to note this was a *factual* finding (presumably limited to the facts of the case), not a legal determination of a general principle applicable to the reservation of rights issue.  *Rusty's* is therefore of no assistance to Britz.

In actuality, courts that have squarely addressed this issue have taken a position contrary to Britz's.  "Waiver requires the intentional relinquishment of a known right upon knowledge of the facts.  The burden is on the party claiming a waiver of right to prove it by clear and convincing evidence that does not leave the matter to speculation.  As a general rule, doubtful cases will be decided against the existence of a waiver.  [Citations.]"  *Ringler Associates Inc. v. Maryland Casualty Co.,* 80 Cal.App.4th 1165, 1188, 96 Cal.Rptr.2d 136 (2000).  "In the insurance context, California courts have applied the general rule that waiver requires the insurer to intentionally relinquish its right to deny coverage, and *a denial of coverage on one ground does not, absent clear and convincing evidence to suggest otherwise, impliedly waive grounds not stated in the denial*.  [Citations.]"  *Id*. (emphasis added); *accord State Farm Fire & Casualty Company v. Jioras,* 24 Cal.App.4th 1619, 1628 n. 7, 29 Cal.Rptr.2d 840 (1994) ("Waiver depends solely on the intent of the waiving party, and is not established merely by evidence the insurer failed to specify the exclusion in a letter reserving rights"); *see also Velasquez v. Truck Ins. Exchange,* 1 Cal.App.4th 712, 722, 5 Cal.Rptr.2d 1 (1991) ("An intention to waive a limitations provision is not evinced by the failure to raise that point in a letter denying a claim").  Britz provides no evidence, let alone clear and convincing evidence, to suggest Nationwide intended to waive its right to assert a non-covered occurrence under the umbrella policy.  Britz points simply to the fact Nationwide's reservation of rights letter asserted only exclusions to deny coverage but did not assert the Skouti action resulted

from a non-covered occurrence. Nationwide's failure to do so cannot, by itself, constitute a waiver.

It is well established "that an insurer that timely and adequately reserves its right to deny coverage and that does not subsequently intentionally waive its reservation of rights is not collaterally estopped by a judgment in favor of a third party against its insured." *J. C. Penney Casualty Ins. Co. v. M.K.,* 52 Cal.3d 1009, 1018, 278 Cal.Rptr. 64, 804 P.2d 689 (1991). California courts uniformly hold an insurer may waive its right to assert a defense of non-coverage by failing to adequately reserve its rights, *see DeWitt v. Monterey Ins. Co.,* 204 Cal.App.4th 233, 245-46, 138 Cal.Rptr.3d 705 (2012), but Britz has provided no authority – and the Court's research reveals no authority – holding a reservation of rights letter must set forth all possible non-coverage defenses on which the insurer could conceivably rely in order to preserve those defenses for a subsequent action disputing coverage, as here. In so arguing, Britz erroneously conflates "the concept of what rights were reserved [with] the concept of what was the basis for the reservation of rights." *California Union Ins. Co. v. Poppy Ridge Partners,* 224 Cal.App.3d 897, 902, 274 Cal.Rptr. 191 (1990). *Poppy Ridge Partners* expressly rejected the argument Britz makes here, holding the fact an insurer invoked certain policy provisions as the bases for its reservation of rights did not preclude the insurer from later claiming whatever rights it could conceivably possess under other, non-invoked provisions. *Id*. Accepting Britz's argument would be equivalent to requiring an insurer to include in a reservation of rights letter a full statement of its anticipated position before it has even gathered facts sufficient to "maintain [that position] in good faith and on reasonable grounds." *Wilson v. 21st Century Ins. Co.,* 42 Cal.4th 713, 723, 66 Cal.Rptr.3d 746, 171 P.3d 1082 (2007). This would effectively nullify the purpose behind a reservation of rights, which " 'exists to protect both the insurer and the insured by allowing the insurer *who is uncertain of its obligations under the policy* to undertake a defense while reserving its rights to ultimately deny coverage following its investigation or to file a declaratory judgment action to determine its obligations.' " *Moon v. Cincinnati Insurance Company,* _F.Supp.2d_, 2013 WL 300872 (N.D.Ga. 2013), at *3 (quoting *Hoover v. Maxum Indemnity Company,* 291 Ga. 402, 406, 730 S.E.2d 413 (2012)) (emphasis added).

Admittedly, "the absence of an intentional waiver does not preclude an estoppel." *Garamendi v. Golden Eagle Ins. Co.,* 116 Cal.App.4th 694, 721, 10 Cal.Rptr.3d 724 (2004). But to the extent Britz truly intends to argue for application of equitable estoppel (even though it cites a waiver case), the argument is still not well taken. The elements of equitable estoppel, again, are as follows: " '(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." *Sandpiper General, supra,* 40 Cal.4th at 279. Britz provides no evidence to suggest Nationwide intended for Britz to believe it would not dispute coverage under the umbrella policy. On the contrary, Nationwide's reservation of rights letter clearly took the position the umbrella policy afforded *no* coverage for the Skouti action. Under these circumstances, Britz's tacit contention Nationwide's failure to assert a non-covered occurrence misled it into believing the Skouti action was a covered occurrence is unreasonable and a complete non sequitur. Furthermore, Britz provides no argument or evidence to explain how it might have detrimentally relied on Nationwide's failure to assert a non-covered occurrence. Compare *Miller v. Elite Ins. Co.,* 100 Cal.App.3d 739, 755-56, 161 Cal.Rptr. 322 (1980) (detrimental reliance where insured assumed there was no coverage dispute and that adverse claim would be settled within policy limits because he was not informed by insurer of insurer's reservation of rights or claimant's offer to settle, and therefore did not retain attorney, negotiate with insurer or claimant, or attempt to settle the claim); *see Aloha Pacific, Inc. v. California Ins. Guarantee Ass'n,* 79 Cal.App.4th 297, 314-15, 93 Cal.Rptr.2d 148 (2000) (no detrimental reliance where, "when asked what [insureds] would have done differently had they known [insurer] would ultimately deny their claim, counsel for [insureds] asserted that he would have gone back to the judge who presided over [underlying] action and sought revisions in that court's findings of fact in an effort to bring [the insureds'] claim within coverage").

Britz also overlooks the fact that Nationwide informed Britz it would be providing (and ultimately did provide) a defense under the *commercial general liability policy*. That Nationwide

agreed to defend under the commercial general liability policy, but not the umbrella policy, is fatal to Britz's estoppel claim. "An insurer can be estopped from raising coverage defenses if, knowing of the grounds of noncoverage, it provides a defense *under the policy* without a reservation of rights, and the insured reasonably relies on this apparently unconditional defense to his detriment." *Jioras, supra,* 24 Cal.App.4th at 1626 (emphasis added). "Under the policy" is the critical language here, because it confirms an insurer may be estopped from disputing coverage under a particular policy only if says or does something to suggest to its insured coverage under *that* policy will not be at issue. The corollary to this proposition, of course, is an insurer who defends (and agrees to defend) only under Policy A cannot be estopped from disputing coverage under Policy B. The insureds in *Jioras* argued, similar to what Britz argues, that because the reservation of rights letter from their insurer did not specifically mention their umbrella policy, the insurer was estopped from subsequently raising a defense of non-coverage under the umbrella policy. The court rejected this contention, finding that because the insurer had informed the insureds it was providing a defense under their primary policy, not umbrella policy, the predicate necessary to estop the insurer from contesting coverage under the umbrella policy did not exist. *Id.* The same is true in this case. Nationwide informed Britz that it would provide a defense under the commercial general liability policy; Nationwide did not agree to defend under the umbrella policy. No estoppel lies as a result.

Estoppel aside, Britz contends Nationwide – in taking the position there was coverage for the Skouti action under the commercial general liability policy – effectively conceded the action arose out of a covered occurrence under the umbrella policy. Like the umbrella policy, the commercial general liability policy provides, "This insurance applies to **bodily injury** and **property damage** only if: [¶] (a) The **bodily injury** or **property damage** is caused by an **occurrence** . . . ." (Bold original.) Both policies define "occurrence" in exactly the same manner: "Occurrence means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Nationwide's position there was coverage for the Skouti action under the commercial general liability policy meant Nationwide believed the action arose out of a covered occurrence

within the meaning of that policy.  Because both the commercial general liability and umbrella policies define "occurrence" identically, the argument goes, it would be inconsistent for Nationwide to contend the action did not arise out of an occurrence within the meaning of the umbrella policy. The Court does not necessarily disagree with Britz's argument.  However, coverage under the commercial general liability policy is not at issue in this case; coverage under the umbrella policy is.  Therefore, even if the Court were to assume Nationwide intended to concede the Skouti action alleged property damage arising out of an occurrence under the commercial general liability policy, it would not eliminate the Court's duty to determine if sufficient evidence exists to create triable issues of material fact whether the Skouti action alleged injury or property damage arising out of a covered occurrence under the umbrella policy. That being said, the Court finds, contrary to Nationwide's contention, triable issues of material fact exist whether coverage was implicated here.

The umbrella policy, again, defines the term "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  The policy does not define the term "accident," but in the context of liability insurance, California courts have construed "accident" to mean " ' "an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown cause." ' [Citations.]" *Delgado v. Interinsurance Exchange of Automobile Club of Southern California,* 47 Cal.4th 302, 308, 97 Cal.Rptr.3d 298, 211 P.3d 1083 (2009).  " 'This common law construction of the term "accident" becomes part of the policy and precludes any assertion that the term is ambiguous.' [Citations.]" *Id.*  "California courts interpreting 'occurrence' " – and, by extension, "accident" – "have focused exclusively on the insured's intent to perform the act which gives rise to liability, not on the insured's state of mind. If the claimant's injuries did not result from an 'accident,' it does not matter whether the insured expected or intended his conduct to cause any harm." *Collin v. American Empire Ins. Co.,* 21 Cal.App.4th 787, 810, 26 Cal.Rptr.2d 391 (1994).  "[A]n injury-producing event is not an 'accident' within the policy's coverage language when all of the acts, the manner in which they were done, and the objective accomplished occurred as intended by the actor. [Citations.]" *Delgado, supra,* 47

Cal.4th at 311-12; *see Dyer v. Northbrook Property & Casualty Insurance Company,* 210

Cal.App.3d 1540, 1547, 259 Cal.Rptr. 298 (1989) ("An intentional act is not an 'accident' ").

However, "coverage is not always precluded merely because the insured acted intentionally and the

[claimant] was injured." *Merced Mutual Insurance Company v. Mendez,* 213 Cal.App.3d 41, 50,

261 Cal.Rptr. 273 (1989).  Even if the insured acted intentionally, an accident may be found to exist

where "some additional, unexpected, independent, and unforeseen happening occurs that produces

the damage." *Id.*  That is to say, "an 'accident' exists when any aspect in the causal series of events

leading to the injury or damage was unintended by the insured and a matter of fortuity." *Id.*; *accord*

*Meyer v. Pacific Employers Insurance Company,* 233 Cal.App.2d 321, 327, 43 Cal.Rptr.542 (1965)

("[T]hat an act which causes an injury is intentional does not take the consequence of that act outside

the coverage of a policy which excludes damage unless caused by accident for if the consequence

that is the damage or injury is not intentional and is unexpected it is accidental in character . . . .")

   *State Farm General Ins. Co. v. Superior Court,* 164 Cal.App.4th 317, 78 Cal.Rptr.3d 828

(2008) (*Wright*) (abrogated on other grounds by *Delgado, supra,* 47 Cal.4th 302), illustrates how,

because of intervening events, an accident may originate with an intentional act.  Joshua Wright and

Jeffrey Lint got into an argument at a party.  *Id.* at 320.  Lint grabbed Wright, picked him up and

attempted to throw him into a swimming pool.  Wright landed on the pool's concrete step and

fractured his right clavicle.  *Id.*  Wright filed a personal injury action against Lint, who sought a

defense under the homeowners' policy his parents had with State Farm, wherein he was an insured.

*Id.* at 322.  The policy covered damages because of bodily injury caused by an occurrence, which in

turn was defined as an accident.  *Id.* at 321.  State Farm denied a defense and indemnity on ground

Wright's injuries were not caused by an accident or occurrence.  *Id.* at 322.  Lint filed an action

against State Farm seeking a declaration his acts were covered under the policy.  Lint then agreed

to pay Wright $60,000 and assigned all of his rights against State Farm to Wright.  In exchange,

Wright amended his complaint to delete all causes of action against Lint except for one sounding in

negligence, and asserted causes of action against State Farm for breach of contract and declaratory

49

relief. *Id*. at 322-23.  The trial court ruled State Farm owed a duty to defend under the policy.  *Id*.

State Farm petitioned for a writ of mandate the Court of Appeal declined to issue.  *Wright, supra,* 164 Cal.App.4th at 331.  The court found Wright's injuries were caused not by Lint's intentional act of throwing him but by the intervening event of landing on the concrete step, and therefore resulted from an accident: "Although he deliberately picked Wright up and threw him at the pool, Lint did not intend or expect the consequence, namely, that Wright would land to on a step. Lint miscalculated one aspect in the causal series of events leading to Wright's injury, namely, the force necessary to throw Wright far enough out into the pool so that he would land in the water.  It is undisputed that Lint did not intend to hurt Wright; he merely intended that Wright land farther out into the water and 'get . . . wet.'  No doubt Lint acted recklessly.  But . . . Lint [ ] threw Wright at the pool without expecting that Wright would land on the cement step . . . .  [T]he act directly responsible for Wright's injury, throwing too softly so as to miss the water, was *an unforeseen or undesigned happening or consequence* and was thus fortuitous. [Citation.] The event here was an accident because *not* all of the acts, the manner in which they were done, and the objective accomplished transpired exactly as Lint intended. [Citations.]"  *Id.* at 328-29 (emphasis original).

In reaching this conclusion, the *Wright* court cited several cases embodying the principle, set forth in *Mendez, supra,* 213 Cal.App.3d at 50, that an accident occurs when some independent and unforeseen cause intervenes to produce the injury.  The most notable, *Meyer, supra,* 233 Cal.App.2d 321, involved an insured that had drilled a well on property adjacent to that of the plaintiffs.  *Id*. at 323.  The drilling caused the ground to vibrate and resulted in damage to the plaintiffs' buildings. *Id*.  The plaintiffs filed an action against the insurer, which obtained summary judgment on ground the damage was intentional and not covered.  The Court of Appeal reversed, finding the damage was accidental: "There was no evidence that the well drillers intended or expected the vibrations which their operation set in motion would cause damage to plaintiffs' property.  In fact, the evidence is to the contrary. [¶] . . . [T]he fact that the vibrations were intentionally caused and that they might possibly cause damage did not make the damage, if it occurred, intentional damage or an expected

50

and therefore nonaccidental consequence of the insured's operation of its business . . . ." *Id*. at 328. The *Wright* court also cited the following hypothetical from *Mendez, see* 164 Cal.App.4th at 328: "When a driver intentionally speeds and, as a result, negligently hits another car, the speeding would be an intentional act. However, the act directly responsible for the injury – hitting the other car – was not intended by the driver and was fortuitous. Accordingly, the occurrence resulting in injury would be deemed an accident." *Mendez, supra,* 213 Cal.App.3d at 50. In the foregoing scenarios, the court explained, some aspect of the chain of causation was not intended but rather arose as a matter of fortuity. Injury was thus accidental even if the act that triggered the events was intentional.

*Delgado* effectively overruled *Wright* (and reaffirmed long-standing California precedent) to the extent *Wright* implied an act is not intentional simply because the actor did not intend to cause injury or operated under a mistaken belief of fact. *See Delgado, supra,* 47 Cal.4th at 307-17. However, *Delgado* did not purport to abrogate the portion of *Mendez*, relied on by *Wright*, holding an accident exists where some independent and unanticipated event in the causal chain occurred to help create the injury. *Delgado* left that portion of *Mendez* completely untouched. *See id.* at 315.

As the basis for its contention of non-coverage, Nationwide now argues the injuries to the Skouti plaintiffs were solely and proximately caused by the intentional misconduct of Britz's employee and could therefore not have resulted from an accident under California law. In making this argument, Nationwide relies first and foremost on the underlying complaint filed against Britz by Ahmad Skouti and Walter Johnsen, which alleged as follows:

> "In the summer of 2002, Defendants recommended the application of a variety of pesticides, fertilizers and agricultural chemicals to Plaintiffs' vineyards, to promote the development of Plaintiffs' crop. Plaintiffs accepted Defendants' recommendation, and purchased from Defendants the recommended products to be applied to their raisin grape vineyards. Additionally, Defendants provided specific instructions concerning when, where and how much of the products to be applied. In fact, Defendant Britz Fertilizers, Inc., was requested to, and did, provide recommendations in the field for the preparation and timing of the recommended applications, and supervised and approved in-field preparations of the recommended applications."

The underlying complaint further alleged:

51

> "Plaintiff Ahmad Skouti applied the materials sold and recommended by Defendant Britz Fertilizers, Inc., to all of their vineyards. Unfortunately, in or about July 2002, Plaintiffs' vines showed signs of chemical burn, including yellowed and damaged leaves, canes and fruit.  Ultimately, the application of the materials recommended by Defendants damaged the vineyards, destroyed a substantial portion of Plaintiffs' crops and inflicted heavy damage to the vines."

Nationwide also adduces evidence from the underlying action showing Britz's pest control advisor Randall Hedman provided the Skouti plaintiffs with use recommendations for a mix of chemicals, containing among others the growth regulator Ethrel, that the plaintiffs applied to their crops. According to Nationwide, the gravamen of the Skouti claim was Hedman breached the professional standard of care because he recommended mixing Ethrel with other chemicals, even though Ethrel was not supposed to be mixed with other chemicals but separately applied.  Nationwide contends because Hedman nevertheless intended to provide the recommendations he did, the crop damage could not have been accidental in nature even if Hedman did not intend for such damage to occur.

If this were the only evidence in the record, the Court might be inclined to agree.  While nothing suggests Hedman intended for his recommendations to cause damage to the crops, it nonetheless appears "all of the acts, the manner in which they were done, and the objective accomplished" – i.e., Hedman's providing recommendations and the Skouti plaintiffs' following Hedman's advice – "occurred as intended by [Hedman]." *Delgado, supra,* 47 Cal.4th at 311-12. Problematically for Nationwide, sufficient evidence exists in the record for a reasonable trier of fact to conclude Hedman's conduct was not the sole proximate cause of the damage (as Nationwide contends) but simply "the starting point of the causal series of events," *id*. at 315, and that some "additional, unexpected, independent, and unforeseen happening" in the causal chain, *Mendez, supra,* 213 Cal.App.3d at 50, occurred to produce the injury.  That evidence may be found in the declaration, submitted by Britz, of crop loss consultant Dale Rush, who testifies as follows:

> "My background specifically includes numerous research and development trials with Ethrel and Prep (Ethephon) leading to registration in commercial use of an Ethephon-containing pesticide product . . . . [¶] I am familiar with the Skouti vineyards that were at issue in Skouti's claim against Britz in 2002 based upon an evaluation of some of those vineyard [sic] in 1994 and of all of those

52

> vineyards in 2005 including a comprehensive assessment of representative vines and crop loads in 2005 and 2006.  I also did several fact finding interviews with both Walid and Ahmad Skouti in 1994 and in 2005-2006.  I personally visited the vineyards . . . ."

Rush further testifies:

> "[I]t has been reported and is generally known in the industry that the Skoutis claimed crop damage from pesticide treatments in 1987, 1994, 2002 and 2005.  In 1987, it was alleged that the crop damage was a result of the application of Ethrel.  In 1994, the Skoutis alleged crop damage from pesticide treatments that did not include Ethrel.  I inspected and investigated in 1994 the crop damage claim.  In 2002, the Skoutis again alleged crop damage from pesticide treatments that included Ethrel.  Again in 2005, the Skoutis alleged crop damage from pesticide treatments that did not include Ethrel."

Rush further testifies:

> "Based upon my inspection of the Skouti vineyards and my review of Fresno County crop reports, it is my opinion that the following factors contributed to the Skouti's [sic] crop failures[.]  The Skouti's [sic] vines often could not support large fruit sets.  The result was vines that developed full symptoms of chlorosis and necrosis, reduced cane growth and dieback, abortion of bunches or portions of bunches (berry/bunch shrivel) [and] bunch rot, even including vine collapse, thereby resulting in lower yields of lower quality raisins and damage to the vines.  Such vine responses were not unique to the Skouti vineyards and occurred regionally.  These conditions also caused the vines to be more susceptible to any added stress, including pesticide applications, water stress and sunburn of leaves and fruit . . . . [¶] In my opinion, symptoms of damage reported at the Skouti vineyards that have been alleged to be caused by Ethephon are caused by numerous alternate biotic and abiotic stresses associated with pests, diseases, environmental conditions, plant age, other chemicals . . . ."

Rush's testimony suggests Hedman's actions did not directly cause the crop damage, and that the damage may have resulted from a myriad of other causative factors independent of Hedman's actions and unforeseen by Hedman.  In other words, Rush's testimony suggests the damage was accidental.  Because Rush's testimony suggests the damage was accidental, and the umbrella policy defines a covered occurrence to mean an accident, a triable issue arises as to whether Britz had coverage here.

In its motion, Nationwide contends the reasoning of *Ray v. Valley Forge Ins. Co.,* 77 Cal.App.4th 1039, 1047, 92 Cal.Rptr.2d 473 (1999), absolutely disposes of this issue.  There, the San Antonio Village Owners Association had hired Richard T. Ray, a former roofing contractor who

owned a professional roof consulting and inspection business, to recommend, specify and approve re-roofing materials for the association. *Id.* at 1043.  The materials Ray specified and approved were unsuitable because they caused upstairs units to become unbearably hot.  The association sued Ray for giving bad advice, and Ray tendered the defense of the action to CNA Insurance Companies under his commercial general liability policy from Valley Forge Insurance Company (Valley Forge), which refused to defend because it believed Ray's policy did not cover professional negligence. After settling with the association, Ray sued Valley Forge for breach of contract and bad faith.  The trial court granted summary judgment for Valley Forge, finding the association sued Ray for giving bad professional advice and had therefore not alleged a covered occurrence, that is, an accident.  *Id*.

The Court of Appeal affirmed.  *Ray, supra,* 77 Cal.App.4th at 1049.  The policy at issue applied to property damage caused by an " 'occurrence,' " which was defined, as in the umbrella policy here, to mean " 'an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  *Id*. at 1045.  On appeal Ray argued that because continuous exposure to the roofing materials he recommended caused the elevated temperatures, the association's complaint alleged an occurrence under the policy.  The court disagreed: " 'An accident . . . is never present when the insured performs a deliberate act . . . . [W]here the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an "accident" merely because the insured did not intend to cause injury.' [Citations.] [¶] [The] [a]ssociation's complaint alleges that Ray acted deliberately as a professional consultant hired to provide advice.  It alleges that Ray intended [the] [a]ssociation to use the materials he selected.  The allegations state that Ray deliberately intended to induce reliance on his recommendations. [Citations.]" *Id.* at 1047. Accordingly, the court reasoned the complaint did not allege tort liability covered by the policy.  *Id*.

Nationwide contends that, just as the professional advice given in *Ray* did not result in an accident in that case, the recommendations given by Hedman could not have resulted in an accident in this case.  Not so.  The injury in *Ray* was, by all indications, the "direct and immediate result of an intended or expected event," *Shell Oil Co. v. Winterthur Swiss Ins. Co.,* 12 Cal.App.4th 715, 751,

15 Cal.Rptr.2d 815 (1993) – Ray's specification and approval of unsuitable roofing materials – in a causal relationship uninterrupted by other factors.  In such cases, "there is no accident."  *Id*.; *see State Farm General Ins. Co. v. Frake,* 197 Cal.App.4th 568, 584, 128 Cal.Rptr.3d 301 (2011) (no accident where "there was no intervening or unintended act between [insured's] conduct and [victim's] injury. [Insured] deliberately struck [victim] in the area of his groin and the strike caused [victim's] injury").  But that was not necessarily true of the injury here.  As the Court discussed above, Rush's opinion testimony suggests the injury to the Skouti plaintiffs was *not* the direct and immediate result of Hedman's actions.  Instead, there may have been independent and unforeseen intervening factors that caused or contributed to the injury.  Thus, *Ray* does not dispose of this issue.

Nationwide further contends Britz should be precluded from arguing the existence of an accident because in the underlying action, Britz's chief financial officer Robert Glassman took the stand and conceded liability on the part of Britz.  Specifically, Glassman testified, "[W]e [Britz] agree that that tank mix had some impact and caused the damage and we'll take some liability on that.  We don't know whether it was alone or with other things, but we'll accept that liability . . . ."

To the extent Nationwide intends to suggest Britz is collaterally estopped from litigating whether the injury in the underlying action resulted from an accident simply because it conceded liability, the argument fails.  "The doctrine of collateral estoppel precludes relitigation of an issue previously adjudicated if: (1) the issue necessarily decided in the previous suit is identical to the issue sought to be relitigated; (2) there was a final judgment on the merits of the previous suit; and (3) the party against whom the plea is asserted was a party, or in privity with a party, to the previous suit."  *Producers Dairy Delivery Co. v. Sentry Ins. Co.,* 41 Cal.3d 903, 910, 226 Cal.Rptr. 558, 718 P.2d 920 (1986).  For collateral estoppel to apply in the manner suggested here, Britz's acceptance of liability would, at a minimum, have to be viewed as equivalent to conceding the injury did not result from an accident.  Nationwide has provided no authority – and the Court's research reveals no authority – to suggest an acceptance of liability for injury necessarily adjudicates the injury as being non-accidental.  If one thing may be gleaned from California's substantial body of personal

injury case law, it is that defendants may be held liable for accidents precipitated by their conduct.[9]

To the extent Nationwide intends to suggest Britz's acceptance of liability in the underlying action was equivalent to conceding Hedman's conduct was the direct and immediate precursor – and thus the sole proximate cause – of the injury, such that Britz effectively conceded there were no additional, independent and unforeseen happenings in the causal chain occurring to produce the injury in a manner sufficient to transform the injury from one directly resulting out of an intentional act into one resulting out of an accident, the argument likewise fails.  The Court shall explain why.

The underlying action essentially sounded in negligence and products liability as it pertained to the allegation that application of the chemical mix recommended by Hedman caused the Skouti plaintiffs' injuries.  In negligence and products liability actions, "California has definitively adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact determination," and "[u]nder that standard, a cause in fact is something that is a substantial factor in bringing about the injury."  *Rutherford v. Owens-Illinois, Inc.,* 16 Cal.4th 953, 968-69, 67 Cal.Rptr.2d 16, 941 P.2d 1203 (1997).  "The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical."  *Id.* at 978.  "Thus, 'a force which plays only an "infinitesimal" or "theoretical" part in bringing about injury, damage, or loss is not a substantial factor' [citation], but a very minor force that does cause harm is a substantial factor [citation]."  *Bockrath v. Aldrich Chemical Co., Inc.,* 21 Cal.4th 71, 79, 980 P.2d 398 (1999) (quoting *Rutherford, supra,* 16 Cal.4th at 969, 978).  "The substantial factor standard generally produces the same results as does the 'but for' rule of causation," adopted in other jurisdictions,

---

[9] The Court offers this example simply to point out that individuals or entities may be held liable for accidents.  The Court does *not* intend to suggest the umbrella policy's use of the phrase "[w]e will pay on behalf of the insured the ultimate net loss which the insured shall become legally obligated to pay . . . because of . . . property damage [ ] caused by an occurrence" means an occurrence must have been precipitated (i.e., caused) by Britz for such an occurrence to be covered under the umbrella policy.  In the Court's view, the term "legally obligated to pay" implied the prerequisite to coverage under the umbrella policy was significantly broader than mere proximate cause, and encompassed not only accidents caused by Britz but also accidents which Britz did not cause but for which it might nevertheless have been held liable.

"which states that a defendant's conduct is a cause of the injury if the injury would not have occurred 'but for' that conduct." *Rutherford, supra,* at p. 969. Unlike the "but for" test, however, the substantial factor test allows for "situations . . . involving independent or concurrent causes[.]" *Id.*

This final characteristic of the substantial factor test – allowing for existence of independent or concurrent causes-in-fact – is key. Nationwide appears to believe (or at least argue), incorrectly, that Britz's acceptance of liability in the underlying action was tantamount to a concession that Hedman's conduct was the sole cause of the Skouti plaintiffs' injuries. Hardly. "Concealed in [Nationwide's] assertion is a supposition contrary to first-year tort law, i.e., that an injury can only have one cause, or that only one tortfeasor can be held liable for it. In fact, of course, it is entirely possible for an injury to result from multiple [ ] acts . . . ." *Cole v. Town of Los Gatos,* 205 Cal.App.4th 749, 769, 140 Cal.Rptr.3d 722 (2012). By accepting liability, Britz conceded nothing more than that Hedman's conduct was *a* substantial factor in causing the injuries. But this does not mean Britz conceded Hedman's conduct was the *only* factor to have caused the injuries: Because the substantial factor test allows for independent causes, the fact Hedman's conduct was a substantial factor cause of the Skouti plaintiffs' injuries does not exclude the possibility that other events may also have been substantial factors within the chain of causation. *See, e.g., Bettencourt v. Hennessy Industries, Inc.,* 205 Cal.App.4th 1103, 1123-24, 141 Cal.Rptr.3d 167 (2012). Indeed, California's civil jury instructions expressly state a substantial factor must only be "more than a remote or trivial factor," but "does not have to be the only cause of the harm . . . ." CACI 430; *see also* CACI 431.

*Cole* rejected the argument Nationwide impliedly makes here. Sara Cole was standing by her vehicle near Blossom Hill Park in the town of Los Gatos when she was hit by a car driven by Lucio Rodriguez, who later pleaded guilty to driving while intoxicated. *Cole, supra,* 205 Cal.App.4th at 754. Cole brought an action against Rodriguez and the municipality, alleging as to the latter that the area where her vehicle had been parked was in a dangerous condition of public property due to the road configuration. *Id.* The trial court granted summary judgment in favor of the municipality, and the Court of Appeal reversed. *Id.* at 781. On appeal, the municipality argued

summary judgment was properly granted on ground that because Rodriguez had pleaded guilty to driving while intoxicated, Cole's injuries were caused by Rodriguez's intoxication.  *Id.* at 769. Citing the doctrine of independent and concurrent causation, the court disagreed: "[The municipality] could not establish an entitlement to summary judgment merely by showing that Rodriguez's inebriation was a cause of plaintiff's injuries.  Rather it had to establish as a matter of law that plaintiff would be unable to present evidence that any condition of the public property where the accident occurred was also a substantial causative factor in bringing about her injuries." *Id*. Similarly, Nationwide cannot obtain a finding the events in this case were non-accidental merely by showing that, through Britz's acceptance of liability, Hedman's actions were a cause of the Skouti plaintiffs' injuries.  Nationwide must show Hedman's actions were the only cause or that no other, independent and unforeseen causes could have brought about the injuries.  That was not done here.

Upon further contemplation, the following questions might immediately spring to mind: If Hedman intended to provide the recommendations that he did, and his recommendations were a substantial factor in causing the Skouti plaintiffs' injuries, would the injuries not have been caused by an intentional act?  How, then, could the events giving rise to liability be deemed an accident?

This, too, the Court shall explain.  Britz's acceptance of liability in the underlying action established that Hedman's conduct was a substantial factor in the chain of causation.  Where that conduct stood on the causal spectrum, however, is entirely unclear.  Nationwide's contention there was no accident presupposes the causal spectrum consisted of only one factor – Hedman's act of providing recommendations (and, to be complete, the Skouti plaintiffs' act of following Hedman's advice) – directly upstream of the injuries.  But as discussed above, Rush's testimony suggests Hedman's recommendations were not the only causal factor upstream of the injuries.  Rather, it appears from Rush's testimony that Hedman's actions might have been followed by multiple independent and unforeseen factors attributable to natural conditions that were substantial and, like Hedman's actions, also caused or contributed to the injuries.  If a reasonable trier of fact were to credit Rush's opinion, it could find an accident had occurred despite the fact that Britz accepted

58

liability.  Britz's acceptance of liability would not be inconsistent with a finding of an accident here because such a finding would not, as Nationwide appears to further imply, conflict with the determination of liability in the underlying action by seeming to absolve Britz of liability.  "[I]n California, it is firmly established that all persons in the chain of causation may . . . be liable to an injured party."  *Talbott v. Csakany,* 199 Cal.App.3d 700, 705, 245 Cal.Rptr. 136 (1988).  "[O]nce a defendant's conduct is found to have been a cause in fact of the plaintiff's injuries," it cannot escape liability unless some other causative factor "operates as a superseding or supervening cause, so as to break the chain of legal causation between the defendant's conduct and the plaintiff's injuries."  *Cole, supra,* 205 Cal.App.4th at 770.  Britz's acceptance of liability in the underlying action bars Britz from arguing, and a jury from finding, the factors identified by Rush operate as superseding causes breaking the chain of causation between Hedman's conduct and the Skouti plaintiffs' injuries and completely relieving Britz of any legal responsibility.  Problematically for Nationwide, a jury need not conclude that the factors identified by Rush are superseding causes in order to find an accident.  Where, as it appears here, the evidence suggests the insured's conduct was merely the first in a series of events culminating in injury, a jury could find an accident by finding the subsequent events constituted independent and *intervening* causes unforeseen by the insured.  There is no requirement that such causes be superseding, *see Mendez, supra,* 213 Cal.App.3d at 50.[10]

The point to take away from all of this is that, under the circumstances, the concepts of "liability" and "accident" are not mutually exclusive: it is both possible as a matter of law for Britz to have been held liable for the Skouti plaintiffs' injuries and for the injuries to have arisen out of an accident.  In the Court's view, this is the correct result for at least two reasons.  Notably, the

---

[10] Intervening causes are not necessarily superseding.  An intervening cause is "one which comes between an antecedent [cause] and a consequence."  *People v. Solis,* 2005 WL 1219645 (Cal.App. 5 Dist. 2005) (unpublished), at *5.  "[F]or an intervening act properly to be considered a superseding cause, the act must have produced 'harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible.' "  *Lugtu v. California Highway Patrol,* 26 Cal.4th 703, 725, 28 P.3d 249 (2001) (quoting *Soule v. General Motors,* 8 Cal.4th 548, 573 n. 9, 34 Cal.Rptr.2d 607, 882 P.2d 298 (1994)).

Skouti plaintiffs sought recompense for, among other things, damage to land.   There is a "fundamental maxim that each parcel of land is unique."   *City of San Jose v. Superior Court,* 12 Cal.3d 447, 461, 115 Cal.Rptr. 797, 525 P.2d 701 (1974) (citing, *inter alia*, Cal. Civ. Code, § 3387). "Although this rule was created at common law, the very factors giving it vitality in the simple days of its genesis take on added significance in this modern era of development.   Simply stated, there are now more characteristics and criteria by which each piece of land differs from every other."   *Id.* at 461-62.   Rush testifies, again, that the Skouti vineyards had conditions that made them susceptible to stress from pesticide applications such as Hedman's recommended chemical mix.   Rush further testifies the "damage reported at the Skouti vineyards . . . [were] caused by . . . biotic and abiotic stresses associated with pests, diseases, environmental conditions, plant age, other chemicals, [and] lack of fertility[.]" Rush's testimony introduces the possibility other factors, on their own and/or in combination with Hedman's actions, created stressors that caused or contributed to the injuries.   In light of this evidence, the principles of causation require a trier of fact distinguish between a threshold inquiry into the origin of these stressors and a subsequent inquiry into the effect these stressors had upon the unique characteristics of the Skouti vineyards.   Even though Hedman's conduct necessarily constituted one of the factors that resulted in the injuries, the various stressors identified by Rush arguably might have had some role in the injuries as well.   This is why the Court cannot view Britz's acceptance of liability as foreclosing the argument there had been an accident.

Perhaps more importantly, there is no evidence the jury in the underlying action either (1) apportioned 100 percent of the fault to Britz, or, assuming 100 percent represented the total causes at fault for the Skouti plaintiffs' injuries, (2) apportioned fault in a manner precluding Britz from now arguing a portion of the fault should be attributable to other, previously unidentified causes. In the absence of such evidence, the Court will not presume the jury did so.[11]   The Court is confident

---

[11] The Court has theories why the jury likely did not apportion fault.   First, Britz was the only defendant in the underlying action, it conceded liability, and nothing suggests it attempted to shift some of the liability to nonparty tortfeasors by presenting an empty chair defense.   Second, the underlying action was essentially for property damage, and the superior court judgment submitted

1    that if the jury had been presented with a special verdict form instructing it to allocate percentages

2    of fault along the lines of proximate cause, and had engaged in an allocation that did not allow for

3    the causes now identified by Rush, Nationwide would have provided a copy of that form here.

4    Nationwide did not.  For this reason as well, Britz's acceptance of liability in the underlying action

5    does not, contrary to Nationwide's contention, preclude a jury from finding an accident.  Based on

6    the foregoing, a triable issue exists whether there was an accident.  Because the umbrella policy

7    defines a covered occurrence to mean an accident, a triable issue exists whether Britz had coverage.

8

9                                                    ---

10

11   Having determined a triable issue of material fact exists whether Britz had coverage under the

12   umbrella policy, the Court ordinarily would now proceed to examine the policy exclusions to

13

14   as evidence by Nationwide shows the damages awarded by the jury were exclusively economic.  *See
15   also Skouti, supra,* 2007 WL 1954089 at *1 (awarding damages for replacement and special
     treatment of property, lost production, future lost profits and lost business opportunities); Cal. Civ.
16   Code, § 1431.2, subd. (b)(1) (" 'economic damages' means objectively verifiable monetary losses
     including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or
17   replacement, costs of obtaining substitute domestic services, loss of employment and loss of business
     or employment opportunities").  California's comparative fault statute (Proposition 51, codified in
18   Cal. Civ. Code, §§ 1431 et seq.) provides that in actions for property damage, an individual
     tortfeasor's liability is limited to its proportionate share of fault as to noneconomic damages only.
19   Cal. Civ. Code, § 1431.2, subd. (a).  However, multiple tortfeasors remain jointly and severally liable
     for the full amount of economic damages.  *See id.,* § 1431.  "Proposition 51 thus allows an injured
20   plaintiff to recover the full amount of economic damages suffered, regardless of which tortfeasor or
     tortfeasors are named as defendants.  The tortfeasors are left to sort out payment in proportion to
21   fault amongst themselves, and they must bear the risk of nonrecovery from impecunious tortfeasors."
     *Aetna Health Plans of California, Inc. v. Yucaipa-Calimesa Joint Unified School District*, 72
22   Cal.App.4th 1175, 1190, 85 Cal.Rptr.2d 672 (1999).  If the jury had awarded noneconomic damages,
     it would have been required to apportion fault among the Skouti plaintiffs, Britz and the remaining
23   "universe of tortfeasors," *DaFonte v. Up-Right, Inc.,* 2 Cal.4th 593, 603, 7 Cal.Rptr.2d 238, 828 P.2d
24   140 (1992) (citations, quotations omitted), to determine the portion of the award for which Britz
     could have been held liable.  But because only economic damages were awarded, even if there had
25   been multiple tortfeasors, the Skouti plaintiffs would have been entitled to recover the full amount
26   of the damages awarded from Britz, regardless of whether fault had been apportioned.
27

28                                                    61

determine if coverage is otherwise excluded.  Prior to its doing so, however, the Court must first address the central arguments of Britz's umbrella coverage theory,[12] as they appear to pertain specifically to the issue of coverage.  Those arguments may be framed as follows: (1) Britz had "products liability coverage" under the umbrella policy, and the recommendations Hedman made incidental to Britz's sale of chemicals to the Skouti plaintiffs fell within the scope of that coverage; and (2) aside from argument #1, this "products liability coverage" was implicated because the underlying action alleged Britz's chemical products were defective and Britz conceded it was liable.

The "products liability coverage" asserted by Britz is not, interestingly, alleged to have been created by any language in the *coverage* section of the umbrella policy.  That is to say, Britz does not contend Hedman's recommendations and/or defects in its chemicals gave rise to a covered occurrence (i.e., an accident).[13]  Instead, Britz contends products liability coverage was created by a provision in the *definitions* section of the umbrella policy specifically dealing with, in the words of the policy itself, "products-completed operations hazard."  This provision reads in pertinent part:

> "**Products-completed operations** hazard includes:
>
> 1.    All **bodily injury** and **property damage** occurring away from premises **you** own or rent and arising out of **your** product or **your** work except:
>
>    a.    Products that are still in **your** physical possession, or
>
>    b.    Work that has not yet been completed or abandoned.
>
> 2.    **Your** work will be deemed completed at the earliest of the following:
>
>    a.    When all of the work called for in **your** contract has been completed.
>
>    b.    When all of the work to be done at the site has been completed if **your** contract calls for work at more than one site.

---

[12] The first of Britz's two remaining theories of liability.

[13] See *Hogan v. Midland National Ins. Co.,* 3 Cal.3d 553, 560, 91 Cal.Rptr. 153, 476 P.2d 825 (1970), and *Geddes & Smith, Inc. v. St. Paul-Mercury Indem. Co.,* 51 Cal.2d 558, 334 P.2d 881 (1959), for insight as to how a product defect may result in an accident.

> c.   When that part of the work done at the job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project."

(Bold original.)  Britz now contends the language of the products-completed operations hazard essentially constituted products liability coverage in that it affirmatively provided coverage for all property damage occurring away from premises Britz owned or rented and arising out of Britz's products (e.g., chemicals) or Britz's work (e.g., Hedman's recommendations), *unless* the products were still in Britz's possession or the work was not completed.  Britz further contends that because its conduct entailed selling chemical products to the Skouti plaintiffs and making recommendations regarding the products' use, the Skouti plaintiffs' injuries were necessarily covered under the products-completed operations hazard as a form of property damage arising out of its products and its work.  Nationwide, conversely, contends the products-completed operations hazard was not an affirmative grant of coverage but rather "complimentary [sic] coverage that [took] over where premises-operations coverage [left] off."  Both parties, insofar as this Court can tell, are mistaken.

Because products-completed operations hazard is given special meaning in the definitions section of the umbrella policy, one would naturally expect the phrase "products-completed operations hazard" to be referenced elsewhere within the policy.  And indeed, it is (twice) – not in the coverage section (I), but in the *exclusions* section (II).  That section provides in pertinent part:

> "**II.   EXCLUSIONS  –  THIS   SECTION CONTAINS PROVISIONS THAT ABRIDGE OR RESTRICT RIGHTS OF COVERAGE UNDER THE POLICY.**
>
> This insurance does not apply to:
>
> . . .
>
> E.   **Property damage** to:
>
> > . . .
> >
> > 6.   that particular part of any property that must be restored, repaired or replaced because **your** work was incorrectly performed on it;

63

. . .

    8.    **your** work arising out of it or any part of it and included in the **products-completed operations** hazard.

. . .

Paragraph 6 of this exclusion does not apply to property damage included in the **products-completed operations** hazard."

(Bold original.) Crucially, the phrase "products-completed operations hazard" is referenced with respect to exclusions E.6 and E.8 only. Aside from this, the phrase does not appear *anywhere* in the umbrella policy other than the definitions section. These circumstances compel two inescapable conclusions. The first is that the products-completed operations hazard cannot, as the parties contend, operate as affirmative/complementary coverage. *See Ray, supra,* 77 Cal.App.4th at 1047 (citing, *inter alia*, *Stanford, supra,* 89 F.3d at 627) ("Neither a policy exclusion nor a definition in a policy exclusion may create coverage"). The second, which follows from the first, is that the products-completed operations hazard existed solely to qualify the scope of exclusions E.6 and E.8.

    As a result, the central arguments of Britz's umbrella theory – i.e., the products-completed operations hazard provided products liability coverage for injuries caused by (i) defective chemicals and (ii) Hedman's recommendations – are without merit and must therefore be dismissed. This does not mean, however, that Nationwide is automatically entitled to summary adjudication of the breach of contract claim: as the Court discussed above in pages 40 to 61 of this order, sufficient evidence exists for a trier of fact to conclude there was an occurrence under the umbrella policy. Nationwide has provided no authority – and the Court's research reveals no authority – to suggest the viability of a plaintiff's theory of liability has any bearing on the determination of whether there was a covered occurrence. The Court further observes Nationwide does not now – and has never – contended that exclusions E.6 and E.8 should apply to bar coverage. Consequently, the Court need not decide whether the products-completed operations hazard applies, because absent a contention exclusions E.6 and/or E.8 apply, whether the products-completed operations hazard applies is

irrelevant.  (Although the Court refrains from making such a finding here, the Court notes Nationwide shall more than likely be precluded from henceforth invoking these exclusions as a defense.  *See Elizabethtown Water Co. v. Hartford Cas. Ins. Co.,* 15 F.Supp.2d 561, 566 (D.N.J. 1998) (holding insurer waived the right to rely on exclusions it failed to raise until after discovery had closed and deadline for dispositive motions had passed); *but see Intel Corp. v. Hartford Acc. & Indem Co.,* 952 F.2d 1551, 1561 (9th Cir. 1991) (holding no waiver absent evidence insurer "attempted to 'sandbag' or mislead [the insured] with the belated announcement of a new grounds for denial of coverage," or that insured was prejudiced by insurer's failure to mention exclusion)).

---

This brings the Court to the exclusions specifically asserted by Nationwide, and to the second of the umbrella policy's disputed provisions: the professional services exclusion (exclusion K), which Nationwide invoked to deny coverage and which Britz contends is inapplicable.  Exclusion K provides insurance does not apply to "[**b**]**odily injury**, **personal injury**, or **property damage** arising out of the rendering or failure to render professional services by the **insured** or by any person for whose acts or omissions the **insured** is legally responsible."  (Bold original.)  Britz now contends the parties understood "professional services" to mean services rendered for a fee, and that because Britz did not charge the Skouti plaintiffs any money for Hedman's recommendations, exclusion K does not preclude coverage for the underlying action.  Nationwide, of course, contends otherwise.

As a threshold matter, the Court notes this will more than likely be an issue of no consequence because, as the Court concluded above, Hedman's recommendations did not by themselves give rise to any accident and were therefore not an occurrence implicating coverage under the umbrella policy.  Because no coverage exists for the recommendations, the applicability of exclusion K is a moot point as it pertains to the recommendations.  Nevertheless, the Court shall address this issue, both in the interest of completeness and to clarify certain findings in this order.

Assuming, *arguendo*, Hedman's recommendations were an occurrence, resolution of this matter would depend on whether the underlying claims arose out of Britz's "rendering or failure to render professional services." The umbrella policy does not expressly define the term "professional services." Because of this, the Court must look to the term's "ordinary and popular" meaning for interpretation purposes. *See AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 825, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990). " 'Professional services' are defined as those ' "arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual." ' [Citation.]" *Tradewinds Escrow, Inc. v. Truck Ins. Exchange,* 97 Cal.App.4th 704, 713, 118 Cal.Rptr.2d 561 (2002). "[C]ourts have held numerous circumstances fall within [an] exclusion for professional services . . . with the unifying factor being whether the injury occurred during the performance of the professional services, not the instrumentality of injury. [Citation.]" *Id.* Under this standard, the professional services exclusion would appear to preclude coverage for part of the underlying action. The Court takes note of the following allegations from the underlying complaint:

> "Defendant Britz Fertilizers, Inc., is a California corporation with its principal place of business in Fresno County, California, which, at all times herein relevant, provided ***farming consultation services*** and, as a retailer and merchant, sold fertilizers, pesticides and other chemicals used in the cultivation of raisin grapes within the County of Fresno.
>
> . . .
>
> At all times relevant herein, Plaintiff Ahmad Skouti retained Defendants' ***services*** pursuant to an oral agreement to provide ***farming consultation services***, and to purchase, as recommended by Defendants, fertilizers, pesticides and other chemicals utilized in the cultivation of raisin grapes, for vineyards cultivated by Plaintiffs in Fresno and Madera Counties. Defendants agreed to provide, and did provide, said ***services*** and products to Plaintiffs for raisin grapes cultivated in the 2002 crop year.
>
> Pursuant to the terms of the parties' agreement, Defendants agreed: [¶] . . . [¶] b. ***To counsel and advise*** Plaintiff Ahmad Skouti in the application of fertilizers, pesticides and other chemicals utilized in the cultivation of table grapes. Implied within the terms of the parties' contract was Defendants' agreement ***to use such care, skill and diligence commonly exercised by farm consultants*** within the

1    Central Valley of California[.]

2    . . .

3    In the summer of 2002, Defendants recommended the application of
     a variety of pesticides, fertilizers and agricultural chemicals to
4    Plaintiffs' vineyards, to promote the development of Plaintiffs' crop.
     Plaintiffs accepted Defendants' recommendation, and purchased from
5    Defendants the recommended products to be applied to their raisin
     grape vineyards. Additionally, Defendants provided specific
6    instructions concerning when, whether and how much of the products
     to be applied. In fact, Defendant Britz Fertilizers, Inc., was requested
7    to, and did, provide recommendations in the field for the preparation
     and timing of the recommended applications, and supervised and
8    approved in-field preparations of the recommended applications."

9    (Bold, emphases added). The underlying action clearly alleged conduct of a predominantly mental

10   or intellectual (as opposed to physical) nature involving specialized knowledge and skill, and

11   therefore asserted a claim along the lines of professional negligence rather than simple negligence.

12   *See Budd v. Nixon*, 6 Cal.3d 195, 98 Cal.Rptr. 849, 495 P.2d 433 (1971) (superseded on other ground

13   by Cal. Code Civ. Proc., § 340.6) ("The elements of a cause of action in tort for professional

14   negligence are: (1) *the duty of the professional to use such skill, prudence and diligence as other*

15   *members of his profession commonly possess and exercise*; (2) a breach of that duty; (3) a proximate

16   causal connection between the negligent conduct and the resulting injury; and (4) actual loss or

17   damage resulting from the professional's negligence") (emphasis added).   Consequently, by

18   accepting liability, Britz essentially conceded it was liable for professional, not simple, negligence

19   inasmuch as Hedman's recommendations were concerned.   Aside from the allegations, there are

20   other indicators that the services provided by Hedman were of a predominantly mental nature and

21   arose out of an occupation involving specialized knowledge.   Pest control advisers, like Hedman,

22   must obtain a license, Cal. Food & Agr. Code, § 12001 ("No person shall act, or offer to act, as an

23   agricultural pest control adviser without first having secured an agricultural pest control adviser

24   license"), and applicants for licensing must be examined for certification in certain enumerated

25   categories, including plant growth regulation. *Id*., § 12022.   Furthermore, the recommendations

26   Hedman wrote for the Skouti plaintiffs were required by law to contain technical information, *see*

27

28                                              67

1    *id.,* § 12003, that could only have been learned through specialized experience or training.  This

2    information would have included all of the following: "(a) The name and dosage of each pesticide

3    to be used or description of method recommended[;] [¶] (b) The identity of each pest to be

4    controlled[;] [¶] (c) The owner or operator, location of and acreage to be treated[;] [¶] (d) The

5    commodity, crop, or site to be treated[;] [¶] (e) The suggested schedule, time, or conditions for the

6    pesticide application or other control method[;] [and] [¶] (f) A warning of the possibility of damages

7    by the pesticide application that reasonably should have been known by the agricultural pest adviser

8    to exist." *Id.*  In light of these circumstances, a reasonable trier of fact would have no choice but to

9    conclude Hedman rendered a professional service by providing recommendations.  Accordingly,

10   even if Hedman's recommendations were deemed an occurrence under the coverage section of the

11   umbrella policy, the resulting coverage would be eliminated by the professional services exclusion.

12           Britz does not dispute that Hedman's recommendations constituted a professional service

13   under the ordinary and popular meaning of the term "professional services."  Instead, Britz contends

14   the term was intended to encompass only services – that is to say, recommendations – rendered for

15   a fee.  To this end, Britz first suggests the term "professional services" is ambiguous, and must be

16   construed in favor of Britz and against Nationwide, because it is not defined in the umbrella policy.

17   Not so.  "[N]either the mere absence of a policy definition nor the presence of a dispute as to the

18   meaning of the provision necessarily renders it ambiguous as a matter of law." *Castro v. Fireman's*

19   *Fund American Life Ins. Co.,* 206 Cal.App.3d 1114, 1120, 253 Cal.Rptr. 833 (1988) (internal

20   citations, quotations omitted).  "A policy provision will be considered ambiguous [only] when it is

21   capable of two or more constructions, both of which are reasonable." *Waller, supra,* 11 Cal.4th 18.

22           Naturally, Britz further suggests the term "professional services" is ambiguous because the

23   construction of the term that best accords with its objectively reasonable expectations differs from

24   the construction that accords with the term's ordinary and popular meaning.  In support of this

25   contention, Britz points to evidence suggesting it expected the term would mean services for a fee:

26           •      At his deposition, Terry Ward testified he understood the term "professional
                    services" meant "consultation for a fee" as that term was used in the context

28                                                    68

of the general liability policy's exclusionary language, and that he arrived at this understanding "at the time [he] was learning about the forms . . . [a]t the beginning of his training," presumably to become a Nationwide underwriter. Ward further testified "the feedback [he] got was that they [Britz] do not charge a separate fee for their agronomist consulting."

- In his declaration, Robert Glassman authenticates "copies of every invoice we [Britz] billed to Mr. Skouti relating to those chemicals . . . which we sold to him and which were the subject of the Skouti Action, the insurance coverage for which is the subject of this lawsuit." A review of the invoices attached to Glassman's declaration shows that, at least as to these invoices, Britz billed Ahmad Skouti only for chemicals, not crop consulting services.

- One of the manuals Nationwide used to train its adjusters states that for the purpose of the Agricultural Consultants endorsement contained in the commercial general liability policy, which adds back coverage for soil, crop and farm consulting that would otherwise have been taken away by the liability policy's own professional services exclusion (an exclusion identical to the umbrella policy's exclusion K), "consulting shall mean consultation services provided to another party for a fee."

From this, Britz contends it expected that exclusion K would apply only to professional services rendered for a fee, and that because Britz did not charge the Skouti plaintiffs a separate fee for its agronomist consulting services (e.g., Hedman's recommendations) but rather included and conditioned such services on the sale of its chemical products, exclusion K does not bar coverage.

Notwithstanding the fact that, as the Court concluded above, Hedman's recommendations were not covered by the umbrella policy (meaning the purported applicability of the professional services exclusion is a non-issue), Britz's argument in the foregoing regard misconceives the relevance of its own expectations. "[A] insured's '. . ."objectively reasonable expectations" may be considered to *resolve* an ambiguous policy provision[.]' " *Lee v. Fidelity Nat. Title Ins. Co.,* 188 Cal.App.4th 583, 597, 115 Cal.Rptr.3d 748 (2010) (emphasis original, internal citations omitted). That is to say, "the insured's expectations are considered only when the policy is ambiguous." *General Reinsurance Corp. v. St. Jude Hospital,* 107 Cal.App.4th 1097, 1108, 132 Cal.Rptr.2d 540 (2003) (citing *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.,* 9 Cal.4th 27, 37, 36 Cal.Rptr.2d 100, 884 P.2d 1048 (1994)); *see* Cal. Civ. Code, § 1649 ("*If the terms of a promise are in any respect ambiguous or uncertain*, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it" (emphasis added)). "[T]hey

cannot be relied upon to create an ambiguity where none exists." *Id*. The term "professional services" is not ambiguous because California courts have ascribed the ordinary and popular meaning of the term to it where it appears in the context of an exclusion. *See Nissel v. Certain Underwriters at Lloyd's of London,* 62 Cal.App.4th 1103, 1110-11, 73 Cal.Rptr.2d 173 (1998) ("[I]f the meaning a layperson would ascribe to contract language is not ambiguous, then that meaning should be applied"). As a result, Britz's expectations are irrelevant. Compare *EOTT Energy Corp. v. Storebrand Internat. Ins. Co.,* 45 Cal.App.4th 565, 575, 52 Cal.Rptr.2d 894 (1996) (holding insured's objectively reasonable expectations relevant where claimed ambiguity in the term "occurrence" could not be resolved by relying on "ordinary or popular meaning of everyday use").

At its core, Britz's argument is not about a facial ambiguity, as its line of reasoning would lead one to believe, but rather special meanings. *See* Cal. Civ. Code, § 1644 ("The words of a contract are to be understood in their ordinary and popular sense . . . unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed"). "Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." *Morey v. Vannucci,* 64 Cal.App.4th 904, 912, 75 Cal.Rptr.2d 573 (1998) (citations omitted). "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and ambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Pacific Gas & Elec. Company v. G.W. Thomas Drayage & Rigging Company,* 69 Cal.2d 33, 37, 69 Cal.Rptr. 561, 442 P.2d 641 (1968).[14]

---

[14] Nationwide contends that because California courts have concluded the term "professional services" and the exclusions within which the term appears are not ambiguous on their face, "parol evidence is not relevant to interpret the exclusion." Not so. "In general, the [parol evidence] rule prohibits the introduction of any extrinsic evidence to alter, vary, or add to the terms of an integrated written agreement." *Julius Castle Restaurant Inc. v. Payne,* 216 Cal.App.4th 1423, 1439, 157 Cal.Rptr.3d 839 (2013). The California Supreme Court in *Pacific Gas & Elec. Company*, however, "liberalized the traditional parol evidence rule (which allowed extrinsic evidence only when the

1    "The fact that the terms of an instrument appear clear to a judge does not preclude the

2    possibility that the parties chose the language of the instrument to express different terms.   That

3    possibility is not limited to contracts whose terms have acquired a particular meaning by trade usage,

4    but exists whenever the parties' understanding of the words used may have differed from the judge's

5    understanding. [¶] Accordingly, rational interpretation requires at least a preliminary consideration

6    of all credible evidence offered to prove the intention of the parties." *Pacific Gas & Elec. Co.,*

7    *supra,* 69 Cal.2d at 39-40 (citations omitted).   "Such evidence includes testimony as to the

8    'circumstances surrounding the making of the argument . . . including the object, nature and subject

9    matter of the writing . . . "so that the court can 'place itself in the same situation in which the parties

10   found themselves at the time of contracting.' " ' " *Id.* at 40 (quoting, *inter alia,* *Universal Sales*

11   *Corporation v. California Press Manufacturing Comp.,* 20 Cal.2d 751, 761, 128 P.2d 685 (1942)).

12       Problematically for Britz, the term "professional services" is not reasonably susceptible of

13   Britz's claimed interpretation even in light of the proffered evidence.   First, although Terry Ward

14   testified he understood "professional services" meant "consultation for a fee" and that Britz did not

15   charge a separate fee for its agronomist consulting services, Ward's testimony hardly establishes

16   Nationwide believed, at the time the umbrella policy was issued, that Britz understood the term

17   "professional services" to mean only services rendered for a fee.   *See* Cal. Civ. Code, § 1649.

18   Second, because the language of Nationwide's adjuster training manual was not incorporated into

19   the umbrella policy itself, Britz cannot rely on that language to create an ambiguity.   Nothing

20

21   _____

22   writing was ambiguous) by rejecting the plain meaning rule: extrinsic evidence relevant to
     interpretation can no longer be barred simply because of a judicial determination that a writing
23   appears to have only one interpretation." *George v. Automobile Club of Southern California,* 201
     Cal.App.4th 1112, 1127, 135 Cal.Rptr.3d 480 (2011) (internal citations, quotations omitted).   "Parol
24   evidence 'is now admissible to show mutually shared meaning of words used irrespective of their
     ordinary meaning[,]' and '[p]arol evidence of custom and usage is similarly admissible to interpret
25   written words.' " *Id.* (quoting *Columbia Casualty Co. v. Northwestern Nat. Ins. Co.,* 231 Cal.App.3d
     457, 470 n. 3, 282 Cal.Rptr. 389 (1991)).   No parol evidence problem exists here, and therefore
26   Britz's extrinsic evidence may properly be considered.   That being said, the proffered evidence, as
     the Court shall explain below, is of no assistance to Britz.
27

28                                                          71

suggests Ward's understanding or the contents of the manual were even communicated by Nationwide to Britz at or before the time the parties contracted for the policy. *See Reigelsperger v. Siller,* 40 Cal.4th 574, 579, 53 Cal.Rptr.3d 887, 150 P.3d 764 (2007) ("[U]ncommunicated subjective intent is irrelevant" in determining the mutual consent of the parties). Third, and perhaps most importantly, none of the evidence sheds any light on the circumstances surrounding the formative stage of the policy, before it was executed by the parties. In sum, Britz has failed to demonstrate "a mutual understanding between [itself] and [Nationwide], or custom or usage, explaining what they understood [the] term . . . to mean." *George, supra,* 201 Cal.App.4th at 1128.

In any case, the evidence suggests Britz received monetary benefits in exchange for Hedman's recommendations despite its implications to the contrary. Notably, Britz concedes its consulting services are included with and conditioned on the sale of its chemical products, even as it points to the absence of invoices showing it charged the Skouti plaintiffs directly for these services. In *Hollingsworth v. Commercial Union Ins. Co.,* 208 Cal.App.3d 800, 256 Cal.Rptr. 357 (1989), the owner of a cosmetics store operating under a merchants insurance policy sued her insurer for breach of contract and bad faith after it refused to defend her in an action brought by a third party who had suffered injuries in an ear piercing performed by one of the store's employees. *Id*. at 803-804. The insurer had invoked an exclusion in the policy stating, similar to here, insurance did not apply to bodily injury or property damage " 'due to the providing of, or failure to provide, any professional service.' " *Id*. at 803. On appeal of the trial court's order granting summary judgment in favor of the insurer, the *Hollingsworth* court observed, "[T]he term 'professional services' . . . generally signifies an activity done for remuneration as distinguished from a mere pastime." *Id*. at 807. The court reasoned, "[A]lthough Hollingsworth did not charge a monetary fee for piercing a customer's ears, neither was it performed gratis. The procedure was offered only with the purchase of a pair of earrings. Undoubtedly, attracting prospective purchasers into the store also provided additional economic incentive to Hollingsworth. Thus, the ear-piercing was a 'professional' service in the sense that it constituted an aspect of the cosmetic sales profession and that it was done for and

72

in anticipation of some form of financial gain." *Id.* at 808-809.  Like the insured in *Hollingsworth*, who was in the business of the disputed activity in that case (i.e., ear piercing), Britz is in the business of the disputed activity here (i.e., providing agronomist consulting services).  Although Britz might not have charged the Skouti plaintiffs a "fee" for Hedman's recommendations, those recommendations – like the ear piercing in *Hollingsworth* – were not performed for free but were offered only with the purchase of chemicals.  Therefore, the recommendations, like the ear piercing, were a professional service in that they constituted an aspect of Britz's business and were done for and in anticipation of financial gain.  Britz does not (and, in the Court's view, cannot reasonably) contend it would offer such services free of charge to anyone who did not also purchase chemicals.

Nevertheless, the Court finds that, even assuming the professional services exclusion operated to exclude certain coverages, summary adjudication of the breach of contract claim would not be warranted in favor of Nationwide because misconduct amounting to professional negligence was not all the underlying complaint alleged.  The Court notes the following additional allegations:

> "Plaintiff purchased fertilizers, pesticides and other chemicals from Defendants. The materials and products were defective and/or unsafe for their intended applications for the cultivation of raisins.
>
> . . .
>
> Defendants breached the implied warranty of merchantability in the contract for the sale of goods in that such goods did not conform to the promises and affirmations of fact made by Defendants.
>
> . . .
>
> Plaintiff purchased the goods from Defendants in reliance upon Defendants' advice.  Defendants had reason to know the particular purpose for which the goods were required, and to select the goods and their application so there was an implied warranty of fitness. [¶] Defendants breached the implied warranty of fitness in that such goods were not fit for their purpose."

These allegations asserted acts of a non-mental/non-intellectual nature arguably not involving specialized knowledge or skill and therefore might have fallen outside the scope of exclusion K.

73

Thus, the existence of exclusion K cannot compel summary adjudication in favor of Nationwide.[15]

Furthermore, even assuming the professional services exclusion applied to bar coverage for *all* of Britz's misconduct, it would not, by reason of the concurrent cause doctrine, serve as ground for summary adjudication in favor of Nationwide.  The concurrent cause doctrine holds that "where a liability insurance policy provides coverage for a loss jointly caused by an insured risk and an excluded risk, the risks constitute concurrent proximate causes of the loss.  So long as one of the causes is covered by the policy, the insurer is liable."  *Blackhawk Corp. v. Gotham Ins. Co.,* 54 Cal.App.4th 1090, 1098-99, 63 Cal.Rptr.2d 413 (1997).  "Although they may be some question whether . . . the [various] causes . . . can be properly characterized as the 'prime,' 'moving' or 'efficient' cause of the [injuries] . . . coverage under [an] insurance policy is equally available to an insured whenever an insured risk constitutes simply *a* concurrent cause of the injuries.  That multiple causes may have effectuated the loss does not negate any single cause; that multiple acts concurred in the infliction of injury does not nullify any single contributory act."  *State Farm Mut. Auto Ins. Co. v. Partridge,* 10 Cal.3d 94, 104-105, 109 Cal.Rptr. 811, 514 P.2d 123 (1973) (emphasis added).  As the Court found above, sufficient evidence exists for a reasonable trier of fact to conclude the Skouti plaintiffs' injuries were caused by an accident (i.e., occurrence) attributable to factors independent of Britz's misconduct.  If this is ultimately adjudged to have been the case, Nationwide would be obligated to indemnify Britz under the umbrella policy, even if the Skouti plaintiffs' injuries also happened to be caused by Britz's rendering or failure to render professional services.

---

This brings the Court to the third of the umbrella policy's disputed provisions: the applicator exclusion (exclusion Q), which Nationwide further invoked to deny coverage and which Britz

_____

[15] At this juncture, the Court simply finds the professional exclusion does not apply to bar coverage for the entirety of the underlying action.  Whether Britz had coverage for any portion of the underlying action to which the exclusion does not apply is an entirely separate question.

contends is likewise inapplicable.  Exclusion Q provides insurance does not apply to "[**b**]**odily injury** or **property damage** arising out of the application of or failure to apply herbicides, pesticides, fertilizer or other similar chemicals."  The exclusion was subsequently modified by an "herbicide/pesticide/fertilizer applicator coverage" endorsement, which provides in pertinent part:

> 1.   Exclusion II.Q. is modified to read as follows:
>
> Q.   Bodily injury or property damage arising out of the application of herbicides, pesticides, fertilizers or other similar chemicals by:
>
> (a) aircraft owned, operated by, rented or loaned to any insured; or
>
> (b) any non-owned aircraft.
>
> . . .
>
> 3.   Coverage for bodily injury and property damage arising out of the application of herbicides, pesticides, fertilizer, or similar chemicals is excluded for any such damage resulting from:
>
> A.   The intentional violation of a Statue [sic], Ordinance, Regulation, license or manufacturer's label requirement applicable to such application;
>
> B.   The failure of the insured to timely apply such Herbicides, Pesticides, Fertilizer or similar chemicals.
>
> C.   The application of herbicides, pesticides, fertilizer or similar chemicals for a purpose other than: crop production activities; killing, repelling or controlling pests, rodents or insects; or killing or controlling weeds.

This herbicide/pesticide/fertilizer applicator coverage endorsement appears to have quadfurcated exclusion Q into four distinct exclusions: whereas insurance for all property damage arising out of the application of or failure to apply herbicides, pesticides, fertilizers or other chemicals was originally excluded, such insurance was excluded under the endorsement only if an application of chemicals was (1) aerial or, aerial or not, (2) involved one or more of three enumerated conditions.

Nationwide now contends the first of the three conditions occurred here – namely, the damage resulted from an intentional violation of the manufacturer's label requirement applicable to

the application of Ethrel.  To support this contention, Nationwide relies on the following evidence:

- In a deposition taken during the Bayer action, Hedman testified it was his understanding of the Ethrel label that it "should not be tank mixed with other materials[.]" Hedman further testified he knew the Skouti plaintiffs were "tank mixing Ethrel with three or four, perhaps as many as five other materials[.]" Hedman further testified that after he told the Skouti plaintiffs verbally they should not mix Ethrel with other chemicals because it was "off label," he did not otherwise attempt to prevent the Skouti plaintiffs from creating such a mixture, but simply "kind of let them do it" because he "had complete confidence in that tank mix" and "felt good about it[.]"  Hedman testified he was confident about the mix "[b]ecause [he] had seen Ethrel go on with each of those materials, with the exception of Danitol, before."

- At another point in the deposition, Hedman testified he refused to provide a written recommendation to the Skouti plaintiffs for a chemical mix containing Ethrel, Danitol, Cryolite and Omite, but that he told them verbally that it would be "okay" to mix Ethrel with the other chemicals because he had "seen it go on before in various different combinations and there was never any problem as long as you didn't have a stressed vineyard, spray in the heat of the day, stuff like that."

- When asked, "At any point in time, were you concerned about the fact you were writing a use recommendation that called for separate application of Ethrel when you knew the Skoutis had applied a tank mix of Ethrel and other chemical components," Hedman testified, "No."

From this, Nationwide contends exclusion Q as endorsed applied to bar coverage because the evidence shows Hedman intentionally violated the Ethrel manufacturer's label requirement by conveying to the Skouti plaintiffs that Ethrel could be mixed with other chemicals when he knew the label did not allow Ethrel to be so mixed.  Having reviewed the pleadings and all competent and admissible evidence, the Court finds that, inasmuch as coverage might have existed under the umbrella policy for property damage caused by an accident arising out of the application of chemicals, whether such coverage was excluded by the endorsement is an issue for the trier of fact.

The reason for this conclusion originates with the fact that the part of the endorsement specifically invoked by Nationwide excludes coverage only for damage "resulting from" the intentional violation of a manufacturer's label requirement.  In the Court's view, the phrase "resulting from" implies some sort of causal relationship between violation and damage – that is, damage must have somehow arisen as a consequence or effect of a violation.  To support its contention damage suffered by the Skouti plaintiffs resulted from an intentional violation of the

Ethrel label requirements, Nationwide provides an expert declaration from Dr. Kassim Al-Khatib, professor of plant science at the University of California, Davis, and agronomist with experience in crop physiology, vegetation management and pest management.  Al-Khatib testifies as follows, based on his review of relevant evidence in this and the underlying actions:

> "[T]he [ ] damage to the Skoutis' crops that occurred in 2002 is consistent with Ethrel/Ethephon damage.  It is my opinion that the tank-mixture Mr. Hedman recommended the Skoutis apply to their vineyards in July 2002, which included Ethrel/Ethephon, caused those damages.  In particular, it is my opinion that the damages to the Skoutis' crops arose from a failure to comply with the manufacturers' labels for Ethrel/Ethephon and Microthial Disperss [sic], as well as Mr. Hedman's failure to conform to the standard of care for PCAs [pest control advisers] in making his agricultural chemical recommendations to the Skoutis."

Al-Khatib's opinion appears to establish the requisite causal link between Hedman's recommendations and the damage to the Skouti plaintiffs.  Problematically for Nationwide, Dale Rush's testimony that the damage resulted from causative factors unrelated to Hedman's recommendations effectively controverts Al-Khatib's opinion that Hedman's recommendations resulted in the damage, and therefore creates a genuine issue of material fact reserved for the jury.

Aside from the issue of whether Hedman's recommendations resulted in the damage is the issue of whether Hedman's recommendations constituted an intentional violation of the Ethrel label requirements.  Additional evidence provided by Britz suggests Hedman's recommendations did not constitute a violation, let alone an intentional violation, of the Ethrel label requirements.  This evidence takes the form of a declaration from agronomist and crop/soil scientist Robert Ehn, who refers to an expert report he provided in the Bayer action.  Ehn stated in that report:

> "The restriction on the Bayer Ethrel brand Ethephon Plant Regulator label prohibits the use of additives unless so noted on the label.  Additives are not pesticides.  They are inert materials designed to be added to the spray mixture in small amounts to improve, strengthen, or otherwise alter the spray mixture. [¶] Bayer Ethrel brand Ethephon Plant Regulator label does not prohibit tank mixes with other pesticides.  The label does prohibit the use of additives not listed, but is silent on restricting tank mixtures.  That decision is left to the grower/user/PCA."

Ehn reaffirms the abovementioned opinions in his declaration and further opines, "[I]t was reasonable, and not against the instructions on the product label, for those who applied Ethrel to

Skouti's property to mix the Ethrel with other pesticides in a tank mixture before applying it to the crops."  Rush likewise provides an opinion on this issue, and his opinion essentially mirrors Ehn's:

> "Mr. Hedman's recommendation to apply a tank mix spray containing Ethrel did not violate the label by the product. [¶] . . . [¶] . . . [T]he product label's indication that Ethrel brand Ethephon plant regulator should not be used 'with additives other than recommended on this label' does not preclude the use the pesticide mixes [sic].  The term 'additive' is not normally understood by PCAs to be associated with pesticide mixes."

In light of this evidence, the Court cannot find the applicator endorsement excludes coverage so as to warrant summary adjudication of the breach of contract cause of action in favor of Nationwide.

Nationwide further contends that, even assuming Hedman did not intentionally violate the Ethrel label requirements, he nonetheless intentionally violated a "statute, ordinance, regulation[ ] [or] license" in a manner sufficient to implicate the intentional violation exclusion because "he did not provide the Skoutis with PURs [pesticide use recommendations] prior to the chemical applications at their ranches, even though he was required to do so[.]"  Specifically, Nationwide contends Hedman's failure to write recommendations for at least 15 of the Skouti plaintiffs' applications violated California Food and Agricultural Code sections 12003 ("Agricultural pest control advisers shall put all recommendations concerning any agricultural use in writing") and 12023 ("An agricultural pest control adviser license may be refused or may be revoked or suspended by the director as necessary to carry out the purposes of this division.  Cause for refusal, revocation, or suspension shall include, but shall not be limited to the following: [¶] (a) Failure to put a recommendation in writing").  Like the question whether Hedman intentionally violated the Ethrel label requirements, the question whether Hedman intentionally violated the California Food and Agricultural Code is of no materiality unless the Court first finds Hedman's recommendations resulted in the damage to the Skouti plaintiffs.  Because there is sufficient evidence to suggest Hedman's recommendations did not result in the damage to the Skouti plaintiffs, making the question a controverted issue to be resolved by a trier of fact, summary adjudication cannot be granted in favor of Nationwide even assuming Hedman did violate the Food and Agricultural Code.

1    In its motion, Britz urges the Court to find as a matter of law that the intentional violation

2  exclusion does not apply, contending there is no evidence to suggest Britz or its employees ever

3  applied any of the chemicals it sold to the Skouti plaintiffs.  The Court declines to make such a

4  finding.  In asserting the exclusion does not apply because there is no evidence to suggest its

5  employees applied chemicals, Britz's argument essentially presupposes the language of the

6  applicator coverage endorsement excluding coverage for "property damage arising out of the

7  application . . . chemicals" refers only to an application of chemicals by the seller-insured (i.e.,

8  Britz), and not also to an application of chemicals by customers who, like the Skouti plaintiffs,

9  purchased chemicals from Britz.  Britz's position is without merit.  "[I]n construing an insurance

10  agreement [courts] must avoid interpretations that would create redundancy in policy language."

11  *Carmel Development Co. v. RLI Ins. Co.,* 126 Cal.App.4th 502, 511, 24 Cal.Rptr.3d 588 (2005).

12  "An interpretation of the policy that . . . render[s] words redundant or superfluous violates all rules

13  of construction."  *Mirpad, LLC v. California Ins. Guarantee Assn.,* 122 Cal.App.4th 1058, 1073, 34

14  Cal.Rptr.3d 136 (2005).  The endorsement expressly excludes coverage for damage arising out of

15  the application of chemicals "resulting from: [¶] B. The failure *of the insured* to timely apply . . .

16  chemicals."  (Emphasis added.)  If, as Britz implies, "application" referred solely to application of

17  chemicals by the insured, and by no one else, there would have been no reason for the policy to

18  specify an exclusion for the *insured*'s failure to timely apply chemicals; the policy could have

19  accomplished as much simply by excluding coverage for damage resulting from failure to timely

20  apply chemicals without reference to the insured.  Through its inclusion of the phase "of the

21  insured," the policy necessarily contemplates that the word "application" refers to applications by

22  parties including, *but not limited to*, the insured.  Because Britz's claimed interpretation would

23  render the phrase "of the insured" superfluous, it cannot be correct.  Accordingly, the Court will not

24  accept Britz's interpretation as a basis for declaring the intentional violation exclusion inapplicable.

25  Based on the foregoing, summary adjudication of the breach of contract/declaratory relief causes of

26  action shall not be granted in favor of either party, and must therefore be denied as to both parties.

27

28                                                            79

1

---

2

3     ***2. Breach of contract and declaratory relief (quote theory)*** – Having determined the breach of

4     contract and declaratory relief claims survive because genuine issues of material fact exist whether

5     the umbrella policy provided Britz with indemnity coverage for the judgment in the underlying

6     action, the Court need not consider whether the claims would survive under the alternative theory

7     alleging coverage through Britz's acceptance of Nationwide's August 31, 2001 insurance quote

8     purportedly offering E&O coverage.  However, the Court shall do so to narrow the issues for trial.

9             Before Britz purchased insurance from Nationwide, it had expiring primary and umbrella

10    policies with MSI.  The MSI umbrella policy provided excess liability coverage for sums Britz

11    became legally obligated to pay as damages because of "injury" (defined as bodily, advertising or

12    personal injury, or property damage) to which the insurance applied, provided the underlying

13    insurance applied or was exhausted, but excluded coverage for "[a]ny liability arising out of the

14    rendering of or failure to render any 'professional services.' " The term "professional services"

15    included "[a]gronomic consultant services, except such services as are provided by you on your

16    behalf which are incidental to the manufacture, sale, handling or distribution of your products . . ."

17            At his deposition, Robert Glassman testified he told Jerry Baird that Britz wanted

18    replacement policies with coverage "same [as] or better" than the MSI policies.  Thereafter, on May

19    31, 2001, Britz submitted an application for insurance through the Jerry Baird Agency.  Gary

20    Gargano replied to Britz by letter dated July 20, 2001, stating, "We received your submission for

21    Britz Fertilizers, Inc., and we appreciated the opportunity to offer you a quote."  Gargano offered

22    some comments he noted in his review of Britz's application and then referred Britz to Terry Ward.

23    On August 31, 2001, Ward sent a memo to the Jerry Baird Agency with insurance quotes for

24    commercial general liability and umbrella policies as requested by Britz.  Glassman testified he

25    resubmitted the quote with his signature, and that prior to signing, Baird confirmed Britz would be

26    getting the same or better coverage under the Nationwide policies as it had under the MSI policies.

27

28                                                    80

Britz now contends Nationwide's August 31, 2001 quote constituted an offer of insurance and that Glassman's acceptance of the quote and Britz's payment of the annual premium created a contract between the parties, which constituted the insurance policy in effect at the time of the misconduct alleged in the underlying action.  Britz further contends the quote – and by extension, the contract – included an E&O endorsement for the quoted umbrella policy, and that because the umbrella policy was confirmed to have coverage equivalent to or better than the MSI umbrella policy, any bodily injury or property damage caused by agronomic consultant services such as Hedman's recommendations would be covered by the E&O endorsement, and not excluded as a professional service, because the evidence shows such services were merely incidental to the manufacture, sale, handling or distribution of Britz's chemical products.  The Court does not agree.

Britz correctly observes the August 31, 2001 quote constituted an offer from Nationwide to Britz to enter into a contract of insurance, *see Howard v. Burlington Ins. Co.,* 347 S.W.3d 783, 789 (Tex.App. 2011), and Britz's acceptance of the quote and payment of a premium, once acknowledged by Nationwide, created that contract.  *See Smith v. Westland Life Ins. Co.,* 15 Cal.3d 111, 117-24, 123 Cal.Rptr. 649, 539 P.2d 433 (1975).  Problematically for Britz, the contract was a temporary insurance binder, which ceased to be effective as soon as the actual policy was issued.

"[A] binder is an independent contract, separate and distinct from the permanent insurance policy.  It is intended to give temporary protection pending the investigation of the risk by the insurer and until issuance of a formal policy or rejection of the insurance application by the insurer." *Ahern v. Dillenback,* 1 Cal.App.4th 36, 48, 1 Cal.Rptr.2d 339 (1991).  "[A] binder evidences that the policy has not yet been issued since the binder is effective until one of two events: the insurance application is rejected or the policy is issued." *Id.*  "Whether or not a valid binder exists is a question of fact insofar as a finding comprehends issues relating to the credibility of witnesses or the weight of the evidence, but a question of law insofar as a finding embraces a conclusion that such factual elements do not constitute a valid [ ] binder." *Spott Electrical Co. v. Industrial Indem. Co.,* 30 Cal.App.3d 797, 805, 106 Cal.Rptr. 710 (1973) (citing *Granco Steel, Inc. v. Workmen's Comp. App. Bd.,* 68

81

Cal.2d 191, 197, 65 Cal.Rptr. 287, 436 P.2d 287 (1968)).  In other words, "[w]hether undisputed facts establish the existence of a binder is question of law."  *Adams v. Explorer Ins. Co.,* 107 Cal.App.4th 438, 451, 132 Cal.Rptr.2d 24 (2003)(citing *Granco Steel, Inc., supra,* 68 Cal.2d at 197).

The undisputed facts here show the portion of the quote signed and returned by Glassman was entitled "CommercialGard Application/Binder," with a "BINDER EFFECTIVE" date of September 10, 2001 and a "BINDER EXPIRATION" date of November 10, 2001.  It further stated:

> "This Company binds the kind(s) of insurance stipulated above.  This insurance is subject to the terms, conditions and limitations of the policy(ies) in current use by the Company.
>
> This binder may be cancelled by the insured by surrendering the binder or by written notice to the Company stating when cancellation will be effective.  This binder may be cancelled by the Company by notice to the insured in accordance with the policy conditions.  This binder is cancelled when replaced by a policy.  If this binder is not replaced by a policy, the Company is entitled to charge a premium for the binder according to the Rules and Rates in use by the Company."

These circumstances compel the Court to find Nationwide issued Britz a binder for the period of September 10, 2001 to November 10, 2001.  Pursuant to the plain language of its terms, the binder would either be cancelled when replaced by a policy or expire by November 10, 2001.  It is unclear when the actual umbrella policy was issued.  (Nationwide appears to contend the policy was issued when it was first delivered sometime in late 2001, whereas Britz appears to contend the policy was not issued until June 2002 because Nationwide was still processing endorsements to both the commercial general liability and umbrella policies at the time, and had not yet determined whether the umbrella policy would be endorsed with E&O coverage.)  Regardless, the binder could not have been effective any later than November 10, 2001.  The binder was therefore not in effect at the time of the misconduct alleged in the underlying action because the misconduct postdated the November 10, 2001 expiration date.  Accordingly, Nationwide could not have breached the contract created by Britz's acceptance of the August 31, 2001 quote – i.e., the binder – by failing to indemnify Britz for the underlying judgment, because that contract was no longer in effect for Nationwide to breach. The only contracts Nationwide could conceivably have breached were the two policies themselves.

Moreover, the quoted umbrella policy was not even as Britz describes it: contrary to Britz's contention, the quote did not state the umbrella policy would contain E&O coverage.  Concerning E&O coverage, the quote stated: "Agriculture Consultants Error and Omission's [sic] coverage has been included in the quote.  Please note that this is not a true E&O coverage.  *It is part of the General Liability* and is therefore on an occurrence basis.  There must be bodily injury or property damage to trigger a claim.  It will not address an economic loss unless there is bodily injury or property damage."  (Emphasis added.)  The quantitative breakdown of coverages in the quote confirms agronomists' errors and omissions coverage was included only in the portion of the quote attributable to the commercial general liability policy, not the umbrella policy.  While the quoted umbrella policy was a "follow form" policy, it expressly followed form only as to the commercial general liability policy's auto, contractual, employers liability, employee benefits and limited pollution coverages.  Britz has not pointed to – and the Court has been unable to identify – any language in the quote that could reasonably be construed as offering an umbrella policy with E&O coverage.  The plain language of the quote simply would not have caused a reasonable person to believe he/she was being offered an umbrella policy with agronomist errors & omissions coverage.

It is true that "[i]n California, within 90 days after the issuance of a binder, the insurance company must issue a policy setting forth a premium and terms that are identical to those indicated in the binder."  *Ahern, supra,* 1 Cal.App.4th at 48 n. 5 (citing Cal. Ins. Code, § 382 ("Within 90 days after issue of a covering note a policy shall be issued in lieu thereof, including within its terms the identical insurance bound under the covering note and premium therefor")).  Britz repeatedly emphasizes the policy forms later issued by Nationwide did not conform to, but were inconsistent with, the August 31, 2001 quote in that the formal umbrella policy – unlike the quoted umbrella policy – did not contain an E&O endorsement.  (Britz identifies several other discrepancies between the quote and the policy that are not at issue here.)  In light of the fact that, insofar as the Court can tell, the terms of the quoted umbrella policy did *not* clearly and expressly provide for an E&O endorsement, Britz cannot reasonably contend, as it appears to do, that the binder controlled E&O

83

umbrella coverage until an umbrella policy with identical E&O coverage was issued.  Based on the foregoing, summary adjudication of Britz's breach of contract claim shall be granted in favor of Nationwide to the extent Britz seeks to enforce the August 31, 2001 quote as against Nationwide.

---

**3. Britz's cause of action for fraud** – Nationwide further moves for summary adjudication of Britz's cause of action for fraud, contending there is no evidence Nationwide misrepresented or concealed any facts.  "The elements of fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage."  *Robinson Helicoper Co., Inc. v. Dana Corp.,* 34 Cal.4th 979, 990, 22 Cal.Rptr.3d 352, 102 P.3d 268 (2004) (citations omitted).  Having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court finds summary adjudication of the fraud claim cannot be granted.  The evidence, when viewed in the light most favorable to Britz, could lead a reasonable trier of fact to conclude that Britz had a policy with another carrier which included E&O umbrella coverage prior to the issuance of Nationwide policies; that Britz and Nationwide negotiated for E&O umbrella coverage, with the intent that the Britz would have as good or better coverage than its previous policies and that the umbrella policy would follow form over the commercial general liability policy in all respects, including as to E&O coverage; that the policies were issued upon concealed or misrepresented facts by Nationwide's agents/adjusters; and that Britz justifiably relied on these representations or non-disclosures by paying a premium it believed was owed specifically because it had purchased E&O coverage. Accordingly, Nationwide's motion for summary adjudication of the fraud claim must be denied.

---

***4. Britz's cause of action for bad faith*** – Nationwide further contends summary adjudication of
Britz's cause of action for bad faith (i.e., breach of the implied covenant of good faith and fair
dealing) should be granted because the existence of a genuine dispute over coverage precludes a bad
faith claim as a matter of law. "To establish a bad faith claim, the insured must show that (1)
benefits due under the policy were withheld and (2) the reason for withholding benefits was
unreasonable or without proper cause." *Century Sur. Co. v. Polisso,* 139 Cal.App.4th 922, 949, 43
Cal.Rptr.3d 468 (2006). Under California's genuine dispute doctrine, " 'an insurer denying or
delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as
to the existence of coverage liability or the amount of the insured's coverage claim is not liable in
bad faith even though it might be liable for breach of contract.' " *Wilson v. 21st Century Ins. Co.,*
42 Cal.4th 713, 723, 68 Cal.Rptr.3d 746, 171 P.3d 1082 (2007) (quoting *Chateau Chamberay
Homeowners Assn. v. Associated Internat. Ins. Co.,* 90 Cal.App.4th 335, 347, 108 Cal.Rptr.2d 776
(2001) (*Chateau Chamberay*)). However, "[t]he genuine dispute rule does not relieve an insurer
from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim."
*Wilson, supra,* 42 Cal.4th at 723. "A genuine dispute exists only where the insurer's position is
maintained in good faith and on reasonable grounds." *Id*. (emphasis omitted). Consequently, when
an insurer unreasonably withholds payment of its insured's claim, it breaches the implied covenant
of good faith and fair dealing. *See Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 818-19, 169
Cal.Rptr. 691, 620 P.2d 141 (1979). "[A]n insurer is not entitled to judgment as a matter of law
where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the
insurer acted unreasonably." *Amadeo v. Principal Mut. Life Ins. Co.,* 290 F.3d 1152, 1162 (9th Cir.
2002) (citing *Neal v. Farmers Ins. Exchange,* 21 Cal.3d 910, 148 Cal.Rptr. 389, 582 P.2d 980, 985
(1978)). Here, it would be inappropriate to grant summary adjudication on the existence of a
genuine dispute because the evidence could support a finding that Nationwide withheld payment,
unreasonably delayed paying, and/or failed to properly investigate the claimed loss. In his
declaration and accompanying 53-page expert report, Britz's expert David F. Peterson opines that

Nationwide, among other things, did not conduct a prompt and thorough investigation of Britz's claim; did not advise Britz about all possible coverages; and violated California's insurance standards and industry practices in handling and resolving the claim.  Based on this evidence, a reasonable trier of fact could conclude Nationwide acted in bad faith.  *See Amerigraphics, Inc. v. Mercury Cas. Co.,* 182 Cal.App.4th 1538, 1556-57, 107 Cal.Rptr.3d 307 (2010).  Accordingly, Nationwide's motion for summary adjudication of the bad faith claim must be denied.

---

***5. Britz's claim for punitive damages*** – Lastly, Nationwide contends that Britz's punitive damages claim fails as a matter of law because there is no evidence of any malice, oppression or fraud by Nationwide.  California Civil Code § 3294 provides "in an action for the breach of an obligation not arising from contract," including in, as here, bad faith insurance actions, "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." Cal. Civ. Code, § 3294, subd. (a).  Britz is entitled to recover punitive damages "if [it] can prove that [Nationwide] not only denied or delayed the payment of policy benefits unreasonably or without proper cause, but, in doing so, was guilty of malice, oppression or fraud." *Jordan v. Allstate Ins. Co.,* 148 Cal.App.4th 1062, 1080, 56 Cal.Rptr.3d 312 (2007).  The Court has already concluded that a reasonable trier of fact could find Nationwide engaged in bad faith.  A trier of fact could further find Nationwide, in doing so, was guilty of oppression – that is, "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights," Cal. Civ. Code, § 3294, subd. (c)(2) – because its refusal to pay certain policy benefits would have caused Britz to be liable for costs attributable to the judgment in the underlying action, all in contravention of Britz's reasonable expectations of coverage under the umbrella policy.  Accordingly, summary adjudication of the punitive damages claim cannot be granted.

# V. DISPOSITION

Based on the foregoing, Britz's motion for partial summary judgment is DENIED in its entirety; Nationwide's motion for summary judgment or partial summary judgment in the alternative is GRANTED in part and DENIED in part:

- summary adjudication of the cause of action for **reformation** is GRANTED in favor of Nationwide and against Britz;

- summary adjudication of the causes of action for **breach of contract** and **declaratory relief** is DENIED as to both parties to the extent Britz seeks to enforce the umbrella policy, but GRANTED in favor of Nationwide to the extent Britz seeks to enforce the August 31, 2001 quote or reform the umbrella policy; and

- summary adjudication of the causes of action for **fraud** and **bad faith** and the **prayer for punitive damages** is DENIED as to both parties.

The Court refers the case to the Magistrate Judge for a trial-setting conference.

IT IS SO ORDERED.

Dated:     October 3, 2013                    _____

SENIOR  DISTRICT  JUDGE

87